ELIOT NATIONAL BANK vs. WOONSOCKET ELECTRIC MACHINE
& POWER CO.

JULY 9, 1910.

PRESENT: Dubois, C. J., Blodgett, Johnson, and Parkhurst, JJ.

(1) *Bills and Notes. Principal and Agent. Banks. Forgery.*

In action on a note, signed by the treasurer and countersigned by the president of defendant, which was a second renewal of an original note identical in form, defendant contended that the signature of the president was a forgery (which fact was found by the trial court), and it appeared that the treasurer was, during all the time from the discount of the first note, a defaulter from defendant in an amount greater than the face of the note; that the note in suit was taken from the back of the note book which contained no stub corresponding to it, and that the president had been accustomed to countersign notes in blank at the request of the treasurer. Plaintiff took the note in good faith.

The entire financial management of defendant was in the hands of its treasurer. It was a large borrower of money, and the treasurer carried on the actual transactions at the banks, received the money, attended to renewals, and also personally passed upon the necessity of negotiating loans and decided in what banks the deposits should be made.

He had personally negotiated at least ten prior notes with plaintiff bank, all of which were paid at maturity from defendant's funds.

The net proceeds of the original note of $5,000, of which the note in suit was a second renewal, were paid to the treasurer, in the form of a check to the order of defendant, which check was deposited to its credit to meet a valid note of the defendant, and was so used:—

*Held,* that, being made in Massachusetts, payable in that State, the decisions of that State would control, as to the authority of the treasurer in that State, and defendant would be bound by his acts.

(2) *Bills and Notes. By-Laws. Principal and Agent.*

A by-law of defendant provided that "The president shall with the treasurer, countersign all notes that may be given by the corporation:"—

*Held,* that, the note containing no provision that it should be invalid unless signed by both officers, and there being no such provision in the by-laws, and being presented to the plaintiff by the treasurer in person, as he had previously presented the prior notes, thus affirming the genuineness of his own signature, defendant was liable.

*Held,* further, that, owing to the method of countersigning notes in advance, the counter-signature of the president might have been omitted without affecting the validity of the note.

ASSUMPSIT.  Heard on exceptions of defendant, and overruled.

BLODGETT, J.  In this action of assumpsit upon a promissory note and the common counts, jury trial was waived in the Superior Court, and after decision for the plaintiff for the full amount of the note, the case is here upon exceptions thereto.

The note in question was in the following form:

"$5,000       Due May 2, 1907.

"WOONSOCKET, R. I., January 2, 1907.

"Four months after date we promise to pay to the order of Ourselves Five thousand Dollars at Eliot National. Bank, Boston, Mass. Value received.

"WOONSOCKET ELECTRIC MACHINE AND POWER CO.,
"L. C. LINCOLN,
"*Treasurer.*

"No. 1259
"Countersigned
"GEO. BATCHELOR,
"*President.*"

(*Indorsements*).
WOONSOCKET ELECTRIC MACHINE AND POWER COMPANY.
L. C. LINCOLN, *Treas.*
L. C. LINCOLN.

The defendant contended at the trial, and the court expressly found, that the countersignature of George Batchelor on the note in suit is a forgery; outside of this question there was virtually no dispute as to the facts in the case.

It appeared that the note in suit was the second renewal of an earlier note discounted at the plaintiff bank.  The original note was discounted at the plaintiff bank on January 2, 1906, and both the original and the first renewal were identical in form with the note in suit.  At the time of the discount of the original note, January 2, 1906, the plaintiff drew its cashier's check for $4,849.17, payable to the defendant company, which check was on the same day deposited to the credit of the

defendant in the International Trust Company in Boston, where the defendant had a regular checking account.   At the time of the first renewal, on July 2, 1906, and again on January 2, 1907, at the time of the second renewal, being the note in suit, interest was paid in advance by checks of the defendant company.   All of the above transactions were carried on, on the part of the defendant, by its treasurer, Levi C. Lincoln.   The note was not paid at maturity, nor has any payment thereon ever been made at any time.   It was duly protested, and notice sent to the indorsers.

Virtually the entire business and financial management of the concern was in the hands of Mr. Lincoln.   It was a large borrower of money at banks, and not only did Mr. Lincoln carry on the actual transactions at the banks, receiving the money, attending to renewals, and receiving the surrender of the old notes, but he personally passed upon the necessity of negotiating loans and decided in what banks the company's deposits should be made.   The board of directors took action upon extraordinary extensions of plant and approved large lighting contracts, but no individual officer, other than Mr. Lincoln, had anything whatever to do with the business or financial management.   Mr. Lincoln was treasurer, secretary, and general manager, both in name and in fact.

It further appeared, against the plaintiff's objection for irrelevancy as matter of law, that during all the period from the discount of the note of January 2, 1906, up to the day of trial, Mr. Lincoln was a defaulter from the defendant company in an amount greater than $5,000; also that the note in suit, bearing the number 1259, was taken from near the back of the note-book, and was not the note next in order in the book to the note immediately preceding it in date; and that the note-book as produced at the trial contained no stub corresponding to the note in suit.

It is not disputed that the plaintiff took the note in perfect good faith.   Mr. Lincoln was satisfactorily introduced at the bank by one of its customers.   Twelve other notes, all in the same form as the note in suit, had been discounted at the bank,

prior to the note in suit, all of which were either paid or renewed at maturity, the first transaction being in June, 1904. There was nothing about any of the transactions in regard to the note in suit, or its predecessors, that raised any suspicion on the part of the bank.

That it may more clearly appear in what manner the business of the defendant company was conducted, the following testimony is set forth at length.

The testimony of Lincoln was uncontradicted on the following points: "Q. 1. What was your position with the defendant company, Woonsocket Electric Machine & Power Company in January 1907? A. Treasurer, secretary, and general manager. Q. 2. And how long did you hold those positions? A. I had held the position as secretary and treasurer since October, 1883; as manager from somewhere in the fall of 1887, if I remember right; I was practically manager before that time. Q. 6. Was the defendant company in the regular course of its business accustomed to borrow money at banks? A. Yes, sir. Q. 7. Can you give any idea what the annual amount of bank loans amounted to? A. They varied in different years according to the extensions made. I should say that the last three or four years of my connection there were in the neighborhood of $500,000.00 a year. Q. 8. Of how many? A. From forty to sixty notes, varying notes, $5,000.00 and $10,000.00, mostly five. Q. 9. Thirty or forty notes of five or ten thousand each, per year? A. Running for different times. Q. 10. At what banks were such loans made? A. At various banks, Woonsocket, Providence, Boston, Franklin, Saylesville, Lynn, Philadelphia; and some other places may be, that I cannot remember. Q. 11. And what was the usual amount borrowed at any one time? A. Late years, ordinarily five thousand dollars; previous years sometimes $2,500.00. Q. 12. And sometimes more than $5,000.00 of late years? A. Ordinarily five. Q. 13. Was the advisability of procuring loans from a bank ever considered or acted upon by the board of directors? A. Only in case of extraordinary extension of the plant, bearing the terms of payment in notes; that is the only way. Q. 14. You

mean in case of bond issues? A. No, sir; in case of large extension of the plant same as a contract with the General Electric Company in 1906 or five, carrying a certain percentage of cash and a certain percentage of notes bearing time of three, four or five or six months, that is the only time. Q. 15. The ordinary loan you made at the bank was not passed upon by the board of directors? A. No, sir. Q. 16. And who did the determining of the advisability of the loan? A. Myself. Q. 17. What was the customary form of note given by the defendant for the money in the bank? A. Payable to the order of ourselves signed by myself, and countersigned George Batchelor, endorsed by myself as treasurer, endorsed in every such case. Q. 18. Was this the case in every—. A. Yes, sir. Q. 19. Who wrote the defendant's name on the back of the note when it was payable to ourselves? A. Myself. Q. 20. You did it invariably? A. Yes, sir. Q. 21. Mr. Batchelor has been president of the company for some six or seven years? A. I should say just about that, since Mr. Buckland's death. Q. 22. And Mr. Heffernan has been vice-president? A. Yes, sir. Q. 23. Do you recall that Mr. Batchelor or Mr. Heffernan or any other officer of the company ever endorsed the company's name on the back of a note? A. Never. Q. 24. Did the company ever do so in any other case except in borrowing money? A. No, sir; only extension of the plant and personal payment to big parties. Q. 28. Going back to the notes given to the banks for loans of money, who carried on the actual transactions at the various banks? A. I did. Q. 29. Did you ever know of Mr. Batchelor or Mr. Heffernan or any other officer of the company taking one of the company's notes to the bank and obtaining money on it? A. No, sir; never. Q. 30. Did the company ever renew its notes? A. Invariably; often. Q. 31. Who attended to the renewal of the notes? A. I would. Q. 32. Who was the old notes returned to? A. Me. Q. 33. Did any other officer of the bank ever carry through a renewal? A. No, sir. Q. 34. Or receive the surrender of the old note at the time of such renewal? A. No, sir. Q. 35. Did you ever borrow

money at the Eliot National Bank in Boston, and give a note in the company's name for such loan? A. Yes, sir. Q. 36. Do you remember how many such loans you negotiated at the Eliot National Bank? A. It is hard to say exactly; I should say somewhere in the neighborhood of ten to twelve, or fifteen. Q. 37. For how much was each note made? A. Five thousand dollars. Q. 38. In what form did you receive the money for such loans? A. Either as cash, sales, draft, or draft on New York or Boston, I forget which one. Q. 39. To whom were those checks or drafts payable? A. To the order of the company. Q. 40. Which company? A. Woonsocket Electric Machine & Power Company. Q. 41. None of them were made to your order? A. No, sir. Q. 42. Who introduced you to the Eliot National Bank? A. Mr. M. L. Cobb. Q. 43. On any of these occasions when you borrowed money, were you accompanied by any other of the officers of the Woonsocket Power Company? A. Never. Q. 44. I hand you herewith, a certain instrument marked " plaintiff's exhibit 9 " (the note in suit) and I ask you if that is your signature on the face of the note? A. Yes, sir. Q. 47. I will ask you who wrote the words: 'Woonsocket Electric Machine & Power Company, L. C. Lincoln treasurer,' on the back of this note? A. I did. Q. 48. Was this the usual form you adopted in endorsing the defendant's name on the back of such a note? A. Yes, sir. Q. 49. And were the other notes that you have discounted at the Eliot National Bank in the same form as this one? A. Yes, sir. Q. 51. What did you receive from the bank in return for this note in suit? A. A renewal note, renewed for the same amount, dated some six months previous. Q. 52. That is, this note is a renewal of an earlier note? A. Yes, sir. Q. 53. And what did you receive from the bank for the earlier note in place of the note which was given for this note now in suit? A. Another note for the same amount, dated some six months previous to that, the original note. Q. 54. That is, the note in suit is a second renewal of the earlier note, discounted by you at the Eliot Bank? A. (No answer). Q. 55. What was the date of the original note? A. Somewhere about the first

of January, 1906.   Q. 56. And was that in the same form as the present note?   A. Yes, sir.   Q. 57. And the first renewal was about six months later?   A. Yes; in July.   Q. 58. And was that in the same form as the present note?   A. Yes, sir. Q. 60.   I hand you herewith Mr. Lincoln, a cashier's check purporting to be the check of the Eliot National Bank, and I ask you if that is the check that you received on the occasion of your discounting the original note of which the present note is a second renewal?   A. Yes, sir.   Q. 61. Who wrote the endorsement on the back of that check?   A. Myself.   Q. 62. What did you do with the cashier's check?   A. Deposited in the International Trust Company, to the credit of the Woonsocket Company.   Q. 63.   How long had the Woonsocket Electric Machine & Power Company had an account with the International Trust Company?   A. I should say somewhere in the neighborhood of 1900 or 1901, I cannot say exactly from memory.   Q. 64.   Did the board of directors ever designate any particular bank or banks in which money was to be deposited?   A. No, sir.   Q. 65. And who determined in what banks deposits should be made? A. Myself.   Q. 66.   In what banks did the company have deposits in January, 1906, to April, 1907?   A.   Citizens National Bank, Producers National Bank of Woonsocket; Franklin National Bank of Franklin, Mass., National Bank of the Republic of Boston, and International Trust Company of Boston.   Q. 69. At the time of the two renewals of the original note, which I understand were about the first of July, 1906, and the first of January, 1907, was any payment of interest made?   A. Yes, sir.   Q. 70. In what form were those payments made?   A. By check drawn on either the Citizens Bank or Franklin or Producers; I think on the Citizens, possibly on the Franklin, not the Producers.   Q. 73. Was the interest at the time of the first renewal of this promissory note paid by the check of the defendant company? A. Yes, sir.   Q. 74.   Signed in the name of the company, do I understand?   A. Yes, sir.   Q. 76. Did you pay interest at the time of the second renewal of this note by a check on the Franklin Bank?   A. As I remember it, yes.   Q. 77. In what

name was that check drawn, who appeared as the drawer of the check?   A.   Woonsocket Electric Machine & Power Company. Q. 78. Will you examine that book before you Mr. Lincoln, and tell me what it is?   A.   It is the note book.   Q. 79. Of the Woonsocket Electric Machine & Power Company?   A. Yes, sir.   Q. 80. That was in use while you were there?   A. Yes, sir.   Q. 81. And what is the date of that first note in the book?   A.   January 9th, 1899.   Q. 82. And the number of that check? '(note)'   A.   602.   Q. 85. The last number used while you were there is what, or approximately?   A.   1064. Q. 86. That is, that book contains approximately 450 notes, or stubs for 450 notes?   A.   Yes sir.   Q. 87. And the majority of those are notes for money received at a bank?   A.   Yes sir. Q. 88. And to the best of your recollection they are all in the form of the note in suit?   A.   Yes, sir.   Q. 89. Payable to 'ourselves'?   A.   Yes, sir.   Q. 90. Endorsed by the Woonsocket Electric Machine & Power Company, L. C. Lincoln, treasurer?   A.   Yes, sir.   Q. 91. And you in every case wrote the endorsement?   A.   Yes, sir.   C. Q. 119. And as a rule how many notes would he (Batchelor) sign up in advance? A.   Ten or fifteen.   C. Q. 133. Did anybody else besides yourself ever make out any of the notes of the company?   A. No, sir.   I want to qualify that with the notes given to the General Electric Company, I think they made them out themselves on that business transaction.   C. Q. 173. The fact is that you have been tried on the embezzlement case?   A. Yes, sir. C. Q. 174.   And are serving sentence?   A. Yes, sir.   C. Q. 183. And what was done with the money that was deposited with the International Trust Company, and that was received from the Eliot National Bank?   Mr. Ham—I object.   The Court—Plaintiff's exception noted.   C. Q. 184. What was done with that money that you received from the—.   A.   It went in the general account of the International Trust Company. C. Q. 187. Was there not at that time a note coming due which was signed by the Woonsocket Electric Machine & Power Company, payable to the International Trust Company? A.   Quite a number of them.   C. Q. 190. And was there a

check drawn upon that fund for the purpose of paying that note? A. Yes; for the purpose of paying that note, yes. C. Q. 191. And is that the check, Mr. Lincoln (handing to witness)? MR. HAM—I object. (Plaintiff's exception noted.) A. I should say it was. C. Q. 194. Please read the check so we can identify it. A. 'Boston, January 2nd, 1906. International Trust Company, pay to the order of ourselves $5,000.00 Five thousand dollars, Woonsocket Electric Machine & Power Company, L. C. Lincoln, treasurer,' Q. 216. What were you accustomed to do as secretary, treasurer, and general manager of the company to the knowledge of the other directors? A. I will answer that. I would say I had absolute management of the company. I made the contracts, bought the supplies, hired men, fixed the wages of the men, and superintendent, assistant superintendent and clerks, fixed rates for lighting, both on the incandescent and arc, made leases of land and buildings, subject afterwards to approval by the board-ratification; formulated all contracts with the exception of the city contract and street railway contract, which were formally acted upon by the board of directors; they were simply acted upon and carried through by myself; I bought all supplies, negotiated all loans and made all necessary extensions of the plant with the exception of a large, what we call extraordinary extension, same as the building of a new power station in 1901; and on that point there the directors started the thing and arranged at that time for the contract for the building, and for the two Westinghouse engines, and the rest was left in my hands and all the special contracts, and with the exception of that afterwards everything was left in my hands, with the exception of the contract for the General Electric Company, with the exception of the board, which was acted upon upon my advice; after negotiating with the General Electric Company, and the Westinghouse, all of the business, negotiating loans, buying supplies, paying for them, making extensions of the line and everything was entirely in my hands. Q. 217. Did Mr. Batchelor have anything to do with the financial or business management of the company? A. No, sir. Q. 218. Did Mr. Heffernan? A. No,

sir. Q. 219. Did any other officer individually have anything to do with the business or financial management of the company? A. No, sir. (p. 119). Q. 1. Mr. Lincoln I would like to ask you if all the notes in the note book which is before you, and which is in evidence, that became due up to the time of your leaving the company, have been paid by the funds —out of the funds of the company? A. Yes; every one."

The testimony of George Batchelor was uncontradicted, except by expert testimony as to the genuineness of his signature in his answer to question 23, on the following points: "Q. 2. You are the president of the defendant corporation? A. Yes, sir. Q. 3. How long have you been such? A. To the best of my recollection about 1901, I think." (p. 130). "Q. 23. This note is dated 'January 2nd, 1907, $5,000.00 four months after date we promise to pay to the order of ourselves five thousand dollars at Eliot National Bank Boston, Massachusetts. Signed, ·Woonsocket Electric Machine and Power Company, L. C. Lincoln, treasurer; countersigned George Batchelor, president,' it is marked exhibit 9 in this case, the number is 1259; Mr. Batchelor is that your signature? A. No, sir. Q. 38. In signing the notes of the company, Mr. Batchelor, what and how did you do it? A. I was usually called on by Mr. Lincoln, either by telephone that he had to have some notes signed. I went to the office and signed the number that he wanted, usually one, or two or three sheets sometimes; always signed them in blank. C. Q. 65. You were accustomed to countersign notes in advance for Mr. Lincoln? A. That was always the custom. C. Q. 66. That was always your custom? A. At his request, yes. C. Q. 67. And did you keep a record of these countersignatures? A. No, sir. C. Q. 68. You have no record at all? A. I never was called upon to do it. C. Q. 69. What was your idea in countersigning the notes in advance? A. It wasn't my idea; it was Mr. Lincoln's idea. C. Q. 70. Your idea was to conform to his convenience? A. Yes; it was at his request that I signed the notes. C. Q. 71. You had absolute trust and confidence in Mr. Lincoln? A. Without question. C. Q. 72. You would do anything in the

nature of countersigning a note that he asked you to? A. At that time. C. Q. 80. Didn't it ever occur to you that it was not any protection for the company if you were giving Mr. Lincoln these countersignatures in advance? A. It never did occur to me in that way, no. C. Q. 81. It never occurred to you that that was meant for the protection of the company; what did you suppose that provision as to countersigning was intended for? A. To increase the value of the note. C. Q. 82. You didn't think you were personally liable by reason of the countersignature? A. I never so considered it, no sir. C. Q. 84. You would sign them whenever Mr. Lincoln would ask you to do so in the book? A. Always. C. Q. 10. Would you say there were twenty signatures in that book which you think are forgeries of your name or more? A. If I say what I think, I think there would be more. C. Q. 102. Perhaps forty? A. I cannot just state the number. C. Q. 103. Can't you give somewhere between twenty and forty? A. No; I cannot. C. Q. 104. But there would be more than twenty? A. I think probably there may be; I am not certain."

It was also stipulated that the following points are agreed upon: "In the above entitled case the following facts are admitted to be true without prejudice to either party to prove any further facts.

"First—The defendant corporation had a bank account in 1905 and 1906 with the National Bank of the Republic of Boston, Massachusetts. On January 2nd, 1906, the balance due to the defendant from said National Bank of the Republic, was $1,674.74.

"Second—The defendant company had a checking account with the International Trust Company of Boston, Massachusetts, from August 25th, 1902, to April 5th, 1907, in which deposits were made by the defendant company and upon which checks were drawn in the ordinary course of business. The following is a statement of the transactions in connection with said checking account during the year 1905:

" Credit.
1905.

| January 1, balance | | $6,043.97 |
|---|---|---|

Debit.
1905.

| February 2 | check | 2,500.00 |
|---|---|---|
| March 29 | check | 2,000.00 |

$4,500.00

Brought forward, credit $6,043.97
Brought forward, debit $4,500.00

1905.

| December 31 | balance | $1,543.97 | $6,043 97 " |
|---|---|---|---|

"The balance due to the defendant in such account on January 1, 1906, was $1,543.97. On said January 2, 1906, a deposit of $5,000.00 was credited in said checking account of the defendant, which amount was made up by a check drawn on Citizens National Bank of Woonsocket, Rhode Island, for $150.83, and a cashier's check of the plaintiff bank for the sum of $4,849.17, which check was made payable to the defendant company, and represented the proceeds of a note of which the note sued upon is a renewal. Said cashier's check will be produced at the trial. The above mentioned deposit was made by Levi C. Lincoln, treasurer of the defendant in the name of said defendant, and the deposit slip which showed the deposits as above recited was also made out by him. Both of said checks were duly paid.

"On January 3, 1906, a check drawn upon said account in behalf of said defendant company and bearing date January 2, 1906, was applied in payment of a note made by the defendant company for $5,000.00, dated August 3, 1905, payable to the order of ourselves, five months after date, at the International Trust Company, Boston, Massachusetts. Said check will be produced at the trial. Said note bears the following endorsements: 'Woonsocket Electric Machine & Power Company L. C. Lincoln, treasurer, L. C. Lincoln.' 'All prior endorse-

ments guaranteed.   Pay to the order of any bank or bank or banker, Girard National Bank, Philadelphia, Joseph Wayne Cashier; received payment the Atlantic National Bank of Boston, by William B. Dennison vice pt.'   Said note will be produced at the trial.   It was a genuine note of the defendant company and is the note number 985 already in evidence, plaintiff's exhibit number 7.   The plaintiff and the defendant agree that the above recited facts are true, and that they may be used by either party in lieu of evidence at any and every trial of the above case, subject to the right of either party to object to any of such facts as incompetent, irrelevant or immaterial.   The court is at liberty to draw inferences of fact from the facts herein stated."   Signed by all the counsel.

The foregoing extended citations from the testimony show clearly that the sole person who determined the amount which the defendant company needed to borrow from time to time, who determined when such amount should be borrowed, who gave the company's notes therefor for many years, to the number of many hundreds, and to the amount of a half–million dollars a year, and in at least ten prior instances personally negotiated at least ten prior notes with the plaintiff bank, all of which were paid at maturity from the company's funds, who attended to their payment or renewal at maturity, who paid the interest on such renewals and who determined where the company's funds should be deposited, and drew checks on such deposits without restriction, was its treasurer Lincoln.   It further appears that the net proceeds of the note for $5,000 dated January 2, 1906, of which this note in suit is a second renewal, were paid to the same authorized agent of the company, its treasurer, in person, in the form of a cashier's check to the order of the company for $4,849.17, and not to the treasurer individually or otherwise, and that said cashier's check was duly deposited to the credit of the checking account of the company in the International Trust Company to meet a valid note of the company maturing there on January 3, 1906, and was used for that purpose.   Being made in Massachusetts and payable in that State, we are of the opinion that the case of *Merchants'*

*National Bank of Gardiner* v. *Citizens' Gas Light Co. of Quincy, et al.*, 159 Mass. 505, 506, is controlling as to the authority of the treasurer in that State in that behalf. The court there says: " As the plaintiff discounted this note before maturity ' in the usual course of its business, without notice or knowledge of any defect or infirmity,' and as its good faith is not questioned, if the note were signed by an officer authorized generally to give notes in its behalf the defendant corporation would be liable, although the agent in signing this particular note exceeded his authority, or the powers of the corporation. *Monument National Bank* v. *Globe Works*, 101 Mass. 57. It is not necessary that the authority of an officer or agent to sign notes in behalf of a corporation should appear in the by-laws, or should have been expressly given by a vote of the directors or of the stockholders. In *Lester* v. *Webb*, 1 Allen, 34, it was said: ' The rule is well settled, that if a corporation permit their treasurer to act as their general fiscal agent, and hold him out to the public as having the general authority implied from his official name and character, and by their silence and acquiescence suffer him to draw and accept drafts, and to indorse notes payable to the corporation, they are bound by his acts done within the scope of such implied authority. *Fay* v. *Noble*, 12 Cush. 1; *Williams* v. *Cheney*, 3 Gray, 215; *Conover* v. *Mutual Ins. Co.* 1 Comst. 290. On the facts proved at the trial, the plaintiff might well claim, if the jury believed the evidence, that the treasurer had authority to indorse the notes in suit, derived not from any express direction, but from the course of conduct and dealing of the treasurer with the knowledge and implied assent of the directors of the corporation." See also *McNeil* v. *Boston Chamber of Commerce*, 154 Mass. 277, 285; *Mining Co.* v. *Anglo-Californian Bank*, 104 U. S. 192."

Upon the common count for money had and received, the plaintiff is entitled to recover. To hold otherwise would be to compel the plaintiff bank to pay the valid indebtedness of the defendant company upon the note aforesaid, dated August 3, 1905, to the Girard National Bank of Philadelphia.

(2)    The defendant strongly urges that the provisions of article 5, section 1, of the by-laws so limit the powers of the treasurer in that behalf that this is not so. The provision is as follows: "It shall be the duty of the president to preside at all meetings of the board of directors or stockholders. He shall, with the treasurer, sign all certificates of stock issued, and shall countersign all notes that may be given by the corporation."

In *Fifth Avenue Bank* v. *Forty Second Street and Grand Street Ferry Co.*, 137 N. Y. at page 240, the court of appeals of New York thus defined the meaning of the verb, to countersign: "This word has a well defined meaning both in the law and in the lexicon. To countersign an instrument is to sign what has already been signed by a superior, to authenticate by an additional signature, and usually has reference to the signature of a subordinate in addition to that of his superior by way of authentication of the execution of the writing to which it is affixed, and it denotes the complete execution of the paper. (Worcester's Dic.)"

As to the signature of the treasurer, no question is made as to its authenticity, and the countersignature of the president of the company could not make more authentic that which was in fact authentic. It further appears that it was the invariable practice of the president to "countersign" all the company's notes in advance of their signature by the treasurer; but this is not a case where, after a genuine signature of the president in blank, the signature of the treasurer was subsequently forged thereto, and we are not required to consider the questions which arise on such a state of facts. Suffice it to say that under the facts in this case we are unable to see that even a genuine signature of the president gave greater validity to the authentic signature of the treasurer.

The note contained no provision that it should be invalid unless signed by both officers; nor is there any provision in the by-laws to that effect. It was presented to the plaintiff bank by the treasurer in person, who by such act affirmed the authenticity and genuineness of his own signature thereto, as he had previously presented in person the prior notes of the defendant

which had been discounted by the plaintiff bank. The uncontradicted testimony of Mr. Burrage, the president of the plaintiff bank, was as follows as to the general custom and usage of banks in this respect: "C. Q. 92. You mean to say then, that the treasurer of a company can go in with a note signed by the president and secretary and two of the directors and all would be necessary would be to show that the treasurer signed it? A. If he is well introduced and the credit of the corporation was sufficient, yes. C. Q. 93. That is the general custom in banks? A. Yes, sir. C. Q. 94. How could you tell whether you had a genuine note or not? A. The entire bank business is founded on good faith and integrity. C. Q. 95. At the same time a man has got to keep up his precaution I suppose? A. We feel that when we are doing business with the authorized treasurer of a corporation, with sufficient credit, we feel we are taking all precaution. C. Q. 96. The fact is, that is the precaution you take and the only precaution? A. Yes, sir."

The trial justice has found, upon conflicting evidence, that the countersignature of Mr. Batchelor on the note in suit was not genuine. There is no evidence in the record which shows why the treasurer could not have obtained the genuine signature of the president in blank on the day this note in suit was given, as readily as theretofore and thereafter.

But be that as it may, and considering the countersignature as invalid, does this relieve the defendant from liability under the facts as disclosed in this case? It is undisputed that for several years notes of the defendant were invariably "countersigned" in blank by the president and before they were signed by the treasurer, if such a contradiction in terms can be said to exist, and it is evident that such countersignatures were utterly worthless as a restraint in any way upon the treasurer. After an unvarying course of business, extending over many years, in which the effect of the genuine signature of the president was for the purpose of restraining the execution of the company's notes by its treasurer, entirely nullified, we do no injustice to the defendant in holding that this note is binding upon the defendant as maker. Had the note not borne the

countersignature of the president, it might in that form have put the plaintiff on enquiry as to the reasons for its absence. But as its presence under the circumstances disclosed in evidence here served no purpose of restraint upon the treasurer for which the by-law was adopted, even when genuine, we see no reason for holding that, because of its invalidity alone, the defendant can now claim that this note is not its binding obligation and that the plaintiff bank must lose and the defendant shall profit thereby in its own wrong and at the bank's expense.

However appropriate this requirement of a countersignature may have been as an internal regulation of the company, we are of the opinion that its function in the case at bar is fittingly defined in the dictum of Tyler, J., in *Lyndon Savings Bank* v. *International Co. et al.*, 75 Vt. 224, 230: "On this point we hold that the defendant having issued the note, duly signed by its president and treasurer, and having received the money upon it, cannot now repudiate it for the reason, if it existed, that the approval of the company's executive committee did not appear upon the note. This was a rule of the company and could not affect the plaintiff, which parted with its money in reliance upon the validity of the note. The by-law was directory to the manager, and was for the obvious purpose of restraining him from borrowing money without the approval of the executive committee, and not to render the note invalid in the hands of a holder without notice, for value."

In *Perry* v. *Council Bluffs Water-Works Co.*, 67 Hun. 456, unanimously affirmed by the Court of Appeals "on opinion below" in 143 N. Y. 637, the court observes that "It would serve no useful purpose to traverse the grounds so carefully gone over by the learned referee, it being sufficient on this branch of the case to say that we concur in his reasoning, and in the conclusion reached." It there appears by the referee's report thus approved and finally ratified by the Court of Appeals, as follows (p. 461): "The company's by-laws provided that the treasurer should sign and indorse all checks, drafts, notes and orders for the payment of money and should pay out the funds of the company under the direction of the board of

directors, and that the president should countersign all checks, drafts, notes, and other evidences of debt; that the board of directors might ' borrow money for the purposes of the company and issue notes and bonds therefor,' and that ' no debt or liability beyond the necessary legitimate business and current expenses of the company should be contracted by any officer of the company without special authority of the board of direct-- ors.'

"Soon after Allen became treasurer he began to issue notes purporting to be the notes of the company and he continued so to do during his whole term.   He issued some forty or fifty notes, all of the form of the note in suit, and the proceeds were used indiscriminately to pay all pool claims and the interest on the mortgage bonds of the Water-works Company and also the current expenses of the company not provided for at Council Bluffs.   These notes were issued without the sanction of any resolution of the board and there is no proof that some of the directors ever heard of them.

"None of the notes were countersigned by Mr. Sewell, the president of the company, as the by-laws required;   Mr. Sheldon, however, not only knew of the proceeding, but actively assisted therein, indorsing several of the notes himself, and in one case in the name of his firm.   Among the notes so issued was the one which came into plaintiff's hands at the time and in the manner I have stated.  .  .  .   But I think the plaintiff's cause does not depend upon a preponderance of proof as to whether the directors knew of the issues of the notes, and if so, whether they knew of it as individuals or officials.   It can rest upon a broader ground, namely, that Allen, during his whole term of office, was not only the treasurer *but the company itself.*   The directors had voluntarily resigned to him the whole management of affairs, and this demanded the raising of money.  .  .  .  .

"In the case of *New York and New Haven Railroad Company,* v. *Schuyler* (34 N. Y. 58), the court say:  ' It is transparent throughout the case, that the board of directors, by passive submission or active surrender, handed over to Schuyler

the substance of all their authority relating to their business in New York, and then for nearly seven years laid down to sleep in supine indifference at his feet.   Aroused by the shock of the calamity which their folly has induced, are they now to look calmly over the wreck with no answer to its innocent victim, but that of Macbeth to the ghost of Banquo?

"'If the managers faithfully perform their duty,' said Strong, J., in *Beers* v. *Phœnix Glass Company* (14 Barb., 360), 'they exercise a constant and vigilant supervision over the acts of their officers, and where such acts are unauthorized, or in opposition to their will, they should, and probably do direct their discontinuance, and in case of willful and palpable violation of duty, dismiss the agent.   If the directors of a company, no matter whether through inattention or otherwise, suffer its subordinate officers to pursue a particular line of conduct for a considerable period without objection, they are as bound to those who are not aware of any want of authority as if the requisite power had been directly conferred.''

"The fact that the notes were not in the form required by the by-laws, and were issued without a previous direction of the board of directors, did not necessarily make them invalid.   In a late case (*Rathbun* v. *Snow*, 123 N. Y., 343), the court of appeals held:

"'Third persons may act upon the apparent authority conferred by the principal upon the agent, and are not bound by secret limitations or instructions qualifying the terms of the written or verbal appointment, that the defense based upon the limitation in the by-laws of the company, of which the plaintiff had no knowledge, cannot be sustained.   By-laws of business corporations are, as to third persons, private regulations binding as between the corporation and its members or third persons having knowledge of them, but of no force as limitations *per se* as to third persons, of an authority which, except for the by-laws, would be construed as within the apparent scope of the agency: (*Fay* v. *Noble*, 12 Cush. 1; *Bank* v. *Smith*, 19 Johns; 115;   *Smith* v. *Smith*, 62 Ill. 493;   2 Mor. on Cor., § 593, and cases cited.)'   (See, also, *Martin* v. *Niagara Falls Paper Co.*,

44 Hun. 130;   *Walker* v. *Wilmington C. and A. R. Co.*, 1 So˙
E. Rep., 366.)

"The plaintiff is not affected by the limitation of defendant's
power to contract debts under its by-laws or the laws of Iowa.
(*Bissell* v. *Mich., So. R. R. Co.*, 22 N. Y. 258; *Curtis* v.
*Leavitt*, 17 Barb. 309; *Steam Nav. Co.* v. *Weed, Id.* 378.)

"And upon the whole case I am of the opinion that the plain-
tiff is entitled to judgment."

In *Martin* v. *Niagara Falls Paper Mfg. Co., supra* (affirmed
in 122 N. Y. 165), it is said (p. 141): "It is contended that the
mortgage and notes are void because not signed by the secre-
tary of the company, as provided by one of its by-laws.   The
by-law seems to have been adopted soon after the organization
of the company, but, so far as the case shows, it had never been
followed, and the notes and other obligations of the company
were signed by the president.   The by-law does not provide
that 'the lack of the signature of the secretary shall render the
instrument void.   Its design is, evidently, to prescribe the
duties which the secretary may be called on to perform, but it
does not prohibit the performance of the duty in question by
the president or other officer to whom, by law or usage, it ordi-
narily pertains.   We think the signature of the secretary was
not essential to the validity of the instrument signed by the
president in the name of the company."

In the cases cited *supra, Perry* v. *Council Bluffs Water-Works
Co.*, and *Martin* v. *Niagara Falls Paper Mfg. Co.*, the notes
were issued by the treasurer without even formal compliance
with the by-laws as to the counter-signature.   In the case at
bar, owing to the invariable method of "countersigning" notes
in advance, the counter-signature of the president might just
as well have been omitted, and without impairing the validity
of the paper.

We hold therefore that the defendant company is liable as
maker of this note under the circumstances of this case.   The
trial justice held the defendant liable as indorser and not liable
as maker, and gave judgment for the plaintiff accordingly.
But inasmuch as the maker and indorser are the same, the

decision of the court below should not be reversed but should be sustained, though upon the ground above stated.

The conclusion to which we have come renders a consideration of the many other questions raised by the exceptions unnecessary, and the order will therefore be

Case remitted to the Superior Court with direction to enter judgment for the plaintiff for the full amount of the note in suit and interest against the defendant as maker thereof.

*Livingston Ham,* for plaintiff.

*John J. Heffernan, James H. Rickard, Jr.,* for defendant.