[Civil No. 2485.  Filed February 10, 1926.]

[243 Pac. 407.]

# MULFORD WINSOR, Plaintiff, v. GEORGE W. P. HUNT, as Governor of the State of Arizona, Defendant.

1. CONSTITUTIONAL LAW—MANDAMUS ISSUABLE TO COMPEL GOVERNOR TO PERFORM MINISTERIAL ACT.—Under Constitution, article 6, section 4, *mandamus* may issue to compel the Governor to perform a ministerial act, notwithstanding article 3, forbidding one department of government to exercise powers of another.

2. OFFICERS—RIGHTS OF OFFICERS COME FROM PEOPLE, DEFINED AND LIMITED BY THE CONSTITUTION.—Rights of public officers, whether executive, legislative or judicial, come from the people, and are defined and limited by the Constitution.

3. MANDAMUS—COUNTERSIGNING BY GOVERNOR OF CLAIM AGAINST STATE HELD TO BE A "MINISTERIAL DUTY."—Where auditor approves claim against state under Civil Code of 1913, paragraph 70, as amended by Session Laws of 1921, chapter 88, the sole duty of the Governor is to countersign warrant under Civil Code of 1913, paragraph 72, as amended by Session Laws of 1923, chapter 13, to attest its authenticity, but without right of reviewing legality of the claim, and such a simple, definite duty, arising under conditions admitted or proved to exist and imposed by law, is ministerial and enforceable by *mandamus*.

4. STATES—APPROVAL OF CLAIM BY GOVERNOR INVOLVES A MATTER OF DISCRETION ONLY WHEN CLAIM IS REJECTED BY AUDITOR.—It is only when auditor rejects a claim against the state, under Civil Code of 1913, paragraph 70, as amended by Session Laws of 1921, chapter 88, that the approval of the claim by the Governor under statute involves a matter of discretion.

5. STATES—ACT ESTABLISHING A CODE COMMISSION DOES NOT REQUIRE FILING OF A SCHEDULE FOR ALLOWANCE OF COMPENSATION TO CLERKS OF COMMISSIONER.—Payments made from special appropriation under Session Laws of 1925, chapter 35, for a Code Commission, are not subject to the approval or certification of the Governor, but to that of the Code commissioner, and hence

---

1. *Mandamus* to Governor to require performance of ministerial duty, see notes in 6 L. R. A. (N. S.) 750; 32 L. R. A. (N. S.) 355; L. R. A. 1917F, 774. See, also, 18 R. C. L. 196.

2. See 22 R. C. L. 455.

claim for compensation by clerk hired by the commissioner does not come within Session Laws of 1922, chapter 35, section 6, requiring the filing of a schedule for its allowance.

6. OFFICERS—"PUBLIC OFFICE" MUST BE CREATED BY LAW, IMPOSING DEFINITE DUTIES INVOLVING EXERCISE OF SOVEREIGN POWER—"EMPLOYMENT."—A position created by law, which imposes definite duties on the incumbent, involving the exercise of some portion of the sovereign power, is a "public office," while one lacking any such elements is an "employment."

7. STATES—LEGISLATOR, APPOINTED AS CLERK BY CODE COMMISSIONER, HELD NOT ENGAGED IN A CIVIL OFFICE OF PROFIT OR TRUST, AND NOT WITHIN STATUTE OF LIMITATIONS APPLYING TO OFFICERS.—Under Session Laws of 1925, chapter 35, section 5, creating only the office of Code commissioner, and authorizing his employment of clerical assistants, but imposing no specific duties or salary on such clerks, and vesting no sovereign powers in them, services of a member of the legislature employed as a clerk by the Code commissioner are not rendered in a "civil office of profit or trust" within the inhibition of Constitution, article 4, part 2, section 5, nor is such clerk within Session Laws of 1917, chapter 80, requiring suit for salary to be brought within 90 days.

8. MANDAMUS—CLERK OF CODE COMMISSIONER HELD ENTITLED TO MANDAMUS TO COMPEL COUNTERSIGNATURE BY GOVERNOR FOR PAYMENT OF HIS COMPENSATION, BECAUSE OF ABSENCE OF ADEQUATE LEGAL REMEDY. — Where state auditor approved claim for compensation of a clerk hired by the Code commissioner under Session Laws of 1925, chapter 35, section 5, and money was appropriated therefor by the legislature, the clerk was entitled to remedy by *mandamus* to compel the Governor to perform the ministerial duty of countersigning signature of the auditor to enable him to collect his compensation; there being no plain, speedy and adequate remedy at law.

---

See (1) 38 **C. J.**, p. 662, n. 72.    (2) 29 **Cyc.**, p. 1431, n. 4.    (3) 38 **C. J.**, p. 662, n. 72.    (4) 15 **C. J.**, p. 378, n. 21; 36 **Cyc.**, p. 896, n. 61 New; p. 903, n. 44.    (5) 36 **Cyc.**, p. 865, n. 96 New.    (6, 7) 29 **Cyc.**, p. 1366, n. 40; 36 **Cyc.**, p. 857, n. 94; p. 865, n. 96 New.    (8) 38 **C. J.**, p. 570, n. 63; p. 662, n. 72.

Original proceeding for Writ of Mandamus.    Writ granted.

Messrs. Armstrong, Lewis & Kramer, for Plaintiff.

---

6.    See 22 **R. C. L.** 381.

Mr. John W. Murphy, Attorney General, and Mr. Earl Anderson, Assistant Attorney General, for Defendant.

LOCKWOOD, J.—The seventh legislature of the state of Arizona, at its regular session in the spring of 1925, passed House Bill No. 229, providing for the revision and codification of the laws of the state of Arizona, and it was duly approved by the Governor on March 16, 1925. Pursuant to the provisions thereof, the Governor appointed F. C. Struckmeyer as Code commissioner.

Section 5 of the act reads as follows:

"Section 5. The said commissioner shall receive a salary of ten thousand dollars ($10,000.00) the year, and shall have power to employ such clerical and stenographic assistance as may be necessary."

On April 16th, 1925, the Code commissioner employed Mulford Winsor, hereinafter called plaintiff, who was president of the state Senate when the act was passed, at an agreed compensation of four hundred dollars per month, to render necessary clerical assistance in and about the revision and codification of the laws under section 5 above quoted. Pursuant to said employment, plaintiff entered upon the discharge of his duties, and rendered such clerical assistance to the commissioner well and satisfactorily from April 16th to June 23d, 1925. On June 22d plaintiff made claim against the state for eight hundred dollars compensation, for two months' services as aforesaid, in two formal demands executed by him in the manner provided by law and approved by the Code commissioner, which were filed with the state auditor. The latter audited and allowed them, and drew in payment thereof two warrants, which were delivered to the Honorable George W. P. Hunt, Governor

of the state of Arizona, hereinafter called defendant, for his counter-signature as required by law. Two days later defendant returned to the auditor these warrants with a letter stating that he had disapproved of the same for reasons set forth in a letter to the Code commissioner. This letter, so far as material to the decision of this case, reads as follows:

"Section 5, part 2, of article 4 of the Constitution of Arizona provides as follows: 'No member of the Legislature, during the term for which he shall have been elected, shall be appointed or elected to any civil office of profit under this state, which shall have been created, or the emoluments of which shall have been increased, during said term.' The appropriation for the revision of the Code was made by the Seventh Legislature, of which Mr. Winsor was a Senator and president of the Senate. Consequently I hold that Mr. Winsor cannot draw any of the funds appropriated for the revision of the Code. . . . The only way my signature can be obtained on any warrant paying a salary to the president of the Senate in connection with the revision of the Code will be upon order of the Supreme Court of the state of Arizona. . . . "

On June 24th a claim for services from June 16th to June 23d was approved by the commissioner, presented to the auditor, and approved by him, and the warrant drawn therefor transmitted to the defendant, who on July 1st returned it without his counter-signature, for the same reasons that he had returned the other warrants. Thereafter, and on November 2d; 1925, plaintiff filed his application as an original matter in this court, setting up, in substance, his employment, his services, the presentation to and approval by the auditor of his claims for compensation, the issuance of the warrants and their transmission to the Governor, and his refusal to countersign the same, and that:

"The counter-signature of each of the three warrants so drawn by the auditor on the treasurer of the state of Arizona in favor of the plaintiff in payment of his compensation for said clerical assistance by him rendered said Code commissioner as herein alleged are acts the performance of which the law specially enjoins on the defendant as a duty resulting from his office as Governor of the state of Arizona, which said duty the defendant has arbitrarily and unlawfully failed and refused to perform.

"VI.   That the plaintiff has no plain, speedy, and adequate remedy in the ordinary course of the law for his wrongs and injuries herein set forth and occasioned by the failure and refusal of the defendant to countersign said warrants,"

—and asking for a writ of *mandamus* directing the defendant to countersign the warrants.

Defendant appeared specially and presented a plea to the jurisdiction of the court, on the ground that:

"The judicial department of the state of Arizona is without jurisdiction to compel the Governor of said state by *mandamus* to do or perform any act, and specially the act which plaintiff here asks this court to compel the defendant to do."

A demurrer was also filed and an answer, which was in effect a general denial, a plea of the statute of limitations under chapter 80 of the Session Laws of 1917, an allegation that plaintiff was ineligible to the position for services in which he claimed pay as aforesaid, under the Constitution, and that plaintiff was never legally employed by the Code commissioner or anyone else to render clerical services, in that the General Appropriation Act does not appropriate funds for payments of this kind, and that no budget was ever filed with the Governor by the Code commissioner prior to July 1st, 1925, showing plaintiff's employment.

The first question presented for our consideration is whether or not this court is authorized to issue a writ of *mandamus* against the Governor of the state. Counsel for defendant cite article 3, of the Constitution, which reads as follows:

"The powers of the government of the state of Arizona shall be divided into three separate departments, the legislative, the executive, and the judicial; and, except as provided in this Constitution, such departments shall be separate and distinct, and no one of such departments shall exercise the powers properly belonging to either of the others,"

—and contend that this constitutional provision restrains the judicial department from interfering with the executive in the discharge of any duty imposed by law upon the latter.

Plaintiff urges, on the other hand, that section 4, article 6, of the Constitution, which reads in part as follows:

"The Supreme Court shall have original jurisdiction in *habeas corpus,* and *quo warranto* and *mandamus* as to all state officers, . . . "

—expressly gives to this court the right to compel *all* state officers, among whom the Governor is included, by *mandamus* to perform the duties imposed upon by them by law.

The general principle involved was discussed, and, in our opinion, the proper rule for its determination set forth by the Supreme Court of the United States in the famous case of *Marbury* v. *Madison,* 1 Cranch, 137, 2 L. Ed. 60. Therein the court, speaking through Chief Justice MARSHALL, says:

"Questions, in their nature political, or which are, by the Constitution and laws, submitted to the executive, can never be made in this court.

"But, if this be not such a question . . . what is there in the exalted station of the officer, which shall

bar a citizen from asserting in a court of justice, his legal rights, or shall forbid a court to listen to the claim; or to issue a *mandamus* directing the performance of a duty, not depending on executive discretion, but on particular acts of Congress and the general principles of law?

"If one of the heads of departments commits any illegal act, under color of his office, by which an individual sustains an injury, it cannot be pretended that his office alone exempts him from being sued in the ordinary mode of proceeding, and being compelled to obey the judgment of the law. How, then, can his office exempt him from this particular mode of deciding on the legality of his conduct if the case be such a case as would, were any other individual the party complained of, authorize the process?

"*It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a mandamus, is to be determined.* [Italics ours.] Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation.

"But where he is directed by law to do a certain act affecting the absolute rights of individuals . . . in such cases, it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment, that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department."

Nor do we think defendant would insist seriously that the writ of *mandamus* does not lie against other state officers, when the act to be performed is ministerial in its nature. His counsel seem to contend, however, that the office of the Governor is of a different and higher nature than the other state offices

created by the Constitution, and for that reason not bound by the same principle.

With this doctrine we can in nowise agree. As was said by the Supreme Court of Nevada in *State* v. *Dickerson,* 33 Nev. 540, 113 Pac. 105:

"Under the Constitution of the United States, which is the supreme law of the land, and the Constitution of Nevada, which we are obligated to obey under oath, we must order enforced any valid law irrespective of sentiment, and against any executive officer enjoined by law to a performance of a ministerial duty if he fails to execute the law. In this great country of ours, as it should be, under a Constitution which was ordained to make all men equal under the law, no man is above the law whether he be the President of the United States or its lowliest citizen—millionaire or pauper; and while in the British and other governments that have not as yet advanced to a republic like ours the people are satisfied with the doctrine that prevails that the king or ruling head is above the law and can do no wrong, yet in this country every American citizen is legally equal before the law, and it is the plain duty of all officers to obey the law which they by oath promised to do, and a writ of mandate should issue to enforce such performance. . . . "

And in *Traynor* v. *Beckham,* 116 Ky. 13, 3 Ann. Cas. 388, 25 Ky. Law Rep. 283, 74 S. W. 1105, is found the following language:

"No man is or should be above the law. That he should not be is in accord with the spirit of a republican form of government. There is no royal prerogative or official position in this country which exempts one from yielding obeisance to the law. There is nothing in the Constitution which forbids the suing of the Governor. While courts cannot control executive acts of the Governor, or executive powers conferred upon him, yet they can control ministerial powers. Ministerial power is certainly inferior to judicial power. If one officer can be con-

trolled in its exercise, why not another? It may be conferred upon one person as well as another. Whether it be conferred upon a governor of a state, or some minor official is the recipient of it, the exercise of it does not require the exercise of judgment or discretion any more by the one than the other. The question as to whether a *mandamus* will lie is not determined by the office of the person against whom it is sought, but the nature of the thing to be done. . . . 'It is said the Governor is the representative of the people, and therefore not responsible. This is true of executive duties, for therein the Constitution, the adopted will of the people, is his warrant of authority; but it is untrue of judicial powers, for therein the judiciary represents the people by the same warrant of authority; and, if he violate the law, which it is the province of the judiciary to enforce by their authority, he is liable to the law. In a government of law instituted by a free people for their own benefit, there is no royal prerogative to do anything wrong, and therefore there can be no representation of their dignity, such as can strike down their law, and prevent its administration by its appropriate functionary.' . . . ''

It is the boast of American democracy that this is a government of laws, and not of men. All rights of any officer, be he executive, legislative or judicial, come from the people, and are defined and limited by the Constitution which created them, and above which none can rise. No office under our system of government is sacrosanct in its nature, and no man is exempt from the regular process of law because he may occupy it.

The Constitution of the state of Arizona expressly states that the Supreme Court shall have original jurisdiction to issue writs of *mandamus* against *all* state officers, without excepting any of them, and we are of the opinion that, as stated in *Marbury* v. *Madison, supra:*

"It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done that the propriety or impropriety of issuing a *mandamus*, is to be determined."

Counsel for defendant have cited to us many cases where it is held that the Governor is not subject to the writ of *mandamus*. On a careful examination and analysis of these cases, it will be found that they fall into three distinct groups. The first is where the thing to be done was executive in its nature, and required discretion. There is no dispute between the parties as to the law under such circumstances, and therefore the cases falling into that category are not in point on the issue before us.

The second class goes off on the theory that the courts have no power to coerce the Governor, and that he might refuse to obey the mandate. This objection is well answered by the court in *State ex rel. Irvine* v. *Brooks,* 14 Wyo. 393, 7 Ann. Cas. 1108, 6 L. R. A. (N. S.) 750, 84 Pac. 488, where the following language appears:

"The answer to that objection is that the jurisdiction of the court does not depend upon its physical ability to enforce its judgments, but upon its right to hear and determine the matter in controversy, or, as the word itself means, the right to declare the law. To refuse to take jurisdiction for that reason would be to assume, which this court will not do, that the Governor might knowingly violate the Constitution and his oath of office, which require him to take care that the laws are faithfully executed. . . . "

And as is said in *Greenwood Cemetery Land Co.* v. *Routt,* 17 Colo. 156, 28 Pac. 1125:

"The argument which has been strongly urged in some cases, though not in this, that the court should not declare the law nor give judgment in a case of this kind against the Governor, because the Governor, as commander in chief of the military, might resist,

29 Ariz.—33

is based upon a very improbable contingency. Such an argument is alike discreditable to the executive and to the judiciary of a free and enlightened state. The Governor would have no more right, nor do we believe he would have any more inclination, in a case of this kind, to resist the mandate of the court, than in a case in which he as a private citizen might be a party, or, for that matter, in a case in which he might not be personally connected with the litigation. In any event, the judiciary cannot properly shrink from its duty. . . . ''

There remains the third class of cases, which does hold that, even though the act be ministerial, the Governor may not be compelled to perform it by *mandamus*. We do not think these cases are sound in logic, or upheld by the weight of authority, nor are they consistent with the spirit of our government or the plain language of our Constitution. We therefore hold that, if the act to compel the performance of which *mandamus* is sought is ministerial in its nature, the court has jurisdiction of the defendant.

The phrase "ministerial duty" has been variously defined. We think that it is well expressed as "a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." *Mississippi* v. *Johnson*, 4 Wall. 475, 18 L. Ed. 437. The countersigning by the Governor of a warrant issued by the state auditor is governed by paragraph 72, Revised Statutes of Arizona of 1913, Civil Code, as amended by chapter 13, Session Laws of 1923, which reads as follows:

"72. All warrants issued by the state auditor, as authorized by law, must be countersigned by the Governor, or by one of his secretaries for him and in his name, before presentation to the state treasurer for payment or indorsement, and in case of absence of the Governor from the state said warrants shall be countersigned by the secretary of state, and, unless

so countersigned, said warrants shall not be considered complete in form or effect as legal obligations against the state.''

Paragraph 70, Revised Statutes of Arizona of 1913, Civil Code, as amended by chapter 88, Session Laws of 1921, provides that, when a claim is made against the state, it must be first presented to the state auditor, whose duty it is to determine whether or not it is authorized by law, and it is only in case the auditor rejects the claim that the Governor has any authority over it. If the auditor has approved it, no right is given to the Governor to pass upon its legality. The responsibility for that rests upon the auditor and upon him alone. The sole duty of the Governor in such circumstances is confined to the "countersigning" of the warrant as set forth in paragraph 72, *supra.*

What is meant by the phrase "countersign"? The word "countersign" is defined as "to sign in addition to the signature of another, in order to attest the authenticity." Webster's New International Dictionary, p. 516; *Bank of Anderson Co.* v. *Foster,* 146 Ky. 179, 142 S. W. 225; *Eliot Nat. Bank* v. *Woonsocket, etc.,* 31 R. I. 57, 76 Atl. 782.

The duty to countersign a document is never interpreted as the right to question the propriety of its issuance. It is somewhat similar in its nature and effect to the acknowledgment of a notary public or the attestation of a witness, and is only to certify to the correctness of the signature of the officer whose duty it is to determine in the first place if the document should be issued. The duty of the Governor, under paragraph 70, in regard to the approval of a claim already rejected by the auditor, which clearly involves discretion, is a very different thing from his countersigning a warrant under paragraph 72, when it has been issued by the auditor on a claim already

approved. This latter leaves no discretion to the Governor. If the warrant is in proper form and duly signed by the auditor, the law imposes on the former the obligation of countersigning it, without the right of reviewing the legality of the claim on which it is based, and without any responsibility therefor. A contrary holding would in effect make the Governor a second auditor, and impose upon him, in addition to his important duties as the chief executive, the necessity of examining in minutest detail every one of the numerous claims against the state. The office of state auditor was created by the Constitution primarily to remove that burden, and it was never contemplated, either by the Constitution or the legislature that the Governor should become a "Pooh Bah." That such is a ministerial duty cannot be doubted.

It is next urged that under chapter 80, Session Laws of 1917, plaintiff was required to bring his suit within ninety days from the time his salary had become due, or it was barred by the statute. This statute, however, expressly applies to state and county "officers" and none others. If plaintiff is a state "officer," the statute of limitations has indeed run. If, however, he be merely an employee or clerk, it does not apply. We therefore pass the consideration of this question, as it will depend upon our determination of the capacity in which plaintiff performed his services.

It is further urged that, since the Code commissioner did not file with the Governor a schedule showing the employment of plaintiff, he is clearly within the provisions of section 6, chapter 35, Session Laws of 1922, which reads in part as follows:

"Disbursements from appropriations made, which are subject to the approval or certification of the Governor are subject to the following restrictions:

"Payments for personal service, except for positions specified in the Appropriation Act shall be made in conformity with schedules and amendments thereto submitted by the respective officers and approved by the Governor, before becoming effective. . . . "

Chapter 35, Session Laws of 1925, establishing the Code commission, provides:

"There is hereby appropriated out of any money in the state treasury, not otherwise appropriated, the sum of thirty-two thousand dollars ($32,000.00), which sum, or so much thereof as may be necessary to carry out the purpose of this act, shall be paid by the state treasurer upon the orders of said commissioner from time to time as the same may be required."

It thus appears that payments made from the special appropriation in the act are not subject to the approval or certification of the Governor, but to that of the Code commissioner. Plaintiff's claim, therefore, does not come within the statute of 1922, and it was not necessary that the Code commissioner should file any schedule with the Governor.

This brings us to the vital question in issue, as to whether the services for which plaintiff claims compensation were in a "civil office of profit or trust." If they were, it is admitted he has no right to recover, as he is within the inhibitions of section 5, part 2, article 4, of the Constitution. The statute authorizes the Code commissioner to "employ such clerical and stenographic assistance as may be necessary," and the evidence showed plaintiff performed "clerical" services for the commissioner. If the services of plaintiff were those of a "public officer" he may not recover; if, however, they were merely those of an "employee," the constitutional inhibition does not affect him.

This is a question of first impression in Arizona, but the same situation has frequently arisen in other states under similar constitutional provisions. There is no entirely satisfactory definition of a "public officer" as distinct from an "employee," though there are many illustrations, and all the authorities recognize that the difference exists. We quote a few of the cases which discuss it.

"The test as to whether a position created by statute is a public office is whether the duties of such position or employment involve the exercise of any part of the sovereign power of the state.

"The duties of a state senator appointed under St. 1909, p. 779, as a tax expert, involving only a contract of employment, and not duties belonging to an office, did not violate Const., art. 4, § 19, as it read prior to amendment of 1916, that no senator during his term shall be appointed to any civil office of profit." *Curtin* v. *State,* 61 Cal. App. 377, 214 Pac. 1030.

"An 'officer' is distinguished from an employee in the greater importance, dignity, and independence of his position, in requirement of oath, bond, more enduring tenure, and fact of duties being prescribed by law." *Bowden* v. *Cumberland County,* 123 Me. 359, 123 Atl. 166.

"As used in Const. art. 14, § 7, providing that no person, who shall hold any office or place of trust or profit, under the United States, or any department thereof, or under the state, etc., shall hold or exercise any other office or place of trust or profit under the authority of the state, provided, etc., the terms 'office' and 'place of trust' are synonymous, and have reference to a public position, involving a delegation to the individual of some part of the sovereign functions of the government, to be exercised for the public benefit." *Wooten* v. *Smith,* 145 N. C. 476, 59 S. E. 649.

"Apart from the statute, the distinction between a public officer and an employee is that the former is charged with duties involving an exercise of some part of the sovereign power in the performance of

which the public is concerned, and which are continuing and not occasional, while one merely performing duties required of him by persons employing him under an express contract or otherwise, though the employer is a public officer and the employment be a public work or business, is a mere employee." *Sanders* v. *Belue,* 78 S. C. 171, 58 S. E. 762.

" 'Although an office is an "employment," it does not follow that every employment is an office. A man may certainly be employed under a contract express or implied to do an act or perform a service without becoming an officer.' An 'office' is defined as 'an employment on behalf of the government in any station of public trust not merely transient, occasional, or incidental.' It is a 'special trust or charge created by competent authority.' The officer is distinguished from the employee in the greater importance, dignity, and independence of his position, in being required to take an official oath, and perhaps to give official bond; in the liability of being called to account as a public offender for misfeasance or nonfeasance in office and usually, though not necessarily, in the tenure of his position." *United States* v. *Schlierholz* (D. C.), 137 Fed. 616.

"An 'office' is based upon some law which defines the duties appertaining to it, and which fixes the tenure, while an 'employment,' as distinguished from an office, is based upon a contract with the employee defining his duties, fixing his compensation, and determining the period of employment, and a duty or employment which arises out of contract, and which is dependent for its duration and extent upon the contract, is not an office, and one so employed is not an agent, but a servant, of the person employing him, although the employers may be public officers, and the employment in and about a public work." *Foucht* v. *Hirni,* 57 Cal. App. 685, 208 Pac. 362.

"Many efforts have been made to define a 'public office,' but it is easier to conceive the general requirements of such an office than to express them with precision in a definition that shall be entirely faultless. It will be found, however, by consulting the cases and authorities, that the most general distinction of a

public office is that it embraces the performance by the incumbent of a public function delegated to him as part of the sovereignty of the state. The fact that a public employment is held at the will or pleasure of another as a deputy or servant, who holds at the will of his principal, is held in the state of Maine to distinguish a mere employment from a public office, for in such case no part of the state sovereignty is delegated to such employees." *State* v. *Jennings,* 57 Ohio St. 415, 63 Am. St. Rep. 723, 49 N. E. 404.

"An office is a public station or position, to which a portion of the sovereignty of the country, either legislative, judicial, or executive, attaches for the time being, and which is exercised for the benefit of the public. High, Rec., § 625. The word itself implies a more or less permanent delegation of a portion of governmental power, coupled with legally defined duties and privileges, continuous in their nature, and which, upon the death, resignation, or removal of the incumbent, devolve upon his successor." *Commonwealth* v. *Murphey* (Pa.), 17 Montg. Co. Law Rep. 174.

"The term 'office' implies a delegation of a portion of the sovereign power to, and possession of it by, the person filling the office"; while an "employment" does not comprehend a delegation of any part of the sovereign authority. *State* v. *Hocker,* 39 Fla. 477, 63 Am. St. Rep. 174, 22 South. 721.

"A public office is defined to be the right, authority, and duty created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public." *State ex rel. Walker* v. *Bus,* 135 Mo. 325, 33 L. R. A. 616, 36 S. W. 636.

We think that in 22 Ruling Case Law, 381, section 12, the chief elements of a "public office" are well summed up. The specific position must be created by law; there must be certain definite duties imposed by law on the incumbent, and they *must involve the*

*exercise of some portion of the sovereign power.* A position which has these three elements is presumably an "office," while one which lacks any of them is a mere "employment." Taking these as the criteria, was plaintiff occupying an "office"? We think it is obvious he was not. The act did not create his position, or indeed any particular position except that of the commissioner. There were no specific duties imposed by the statute upon any of the persons rendering "clerical and stenographic assistance," and, above all, there was certainly no shadow of any of the sovereign power of the state vested in plaintiff. He was no more an "officer" than any stenographer or clerk in the employ of the corporation commission, or gardener or janitor working about the capitol building; nay, not even so much so, for most of these last employments are specifically mentioned in the general appropriation bill, and their salaries annexed thereto and fixed, while under the act in question there was no provision as to salaries, either in detail or in gross, nor as to the number of clerks or stenographers. Whatever might be thought of the propriety of a member of the legislature seeking and securing employment under the circumstances of this case, we think it plain that in no respect were his services to the Code commissioner rendered in a "civil office of profit or trust," and there was no constitutional inhibition forbidding his performing them.

The last question is whether, assuming all these things to be true, plaintiff had any plain, speedy and adequate remedy at law. We think the facts of this case show clearly that he has not. It is suggested by counsel for defendant that he might bring an action against the state to recover his salary. If the officer whose duty it was to pass upon the validity of his claim had determined he was not entitled to his money, there might be some merit in this contention.

It appears, however, from the record, that the state auditor has approved the claim as a valid one. The warrants have been issued thereon; there has been an appropriation by the legislature of money to pay this particular type of claims; and the funds are now presumably in the hands of the state treasurer. All that remains to be done in order that plaintiff may recover what, under the facts of this case, he is legally entitled to, is that defendant shall perform the ministerial duty of countersigning the signature of the auditor. No ordinary suit to be brought by plaintiff could establish in him more rights than he now has, and the only method we know whereby the relief which he seeks could be obtained is a proceeding of this kind.

Since the court has jurisdiction of the subject matter of the case and of the defendant, since, under the law and the facts as presented before us, the plaintiff is entitled to have the warrants in question countersigned by the defendant, since the latter has expressly stated in writing he will not so countersign them except upon an order of this court, and since there is no other form of proceeding whereby we are authorized to give such an order than one of this nature, we are of the opinion that the plaintiff is entitled to his writ as prayed for.

We do not, however, issue the writ at the present time. Our knowledge of the chief executive of this state, and our confidence in his high principles and devotion to that Constitution of which he was one of the principal framers, is such that we are satisfied upon our statement of what the law of Arizona requires he will not hesitate to perform the duty imposed on him by that law.

McALISTER, C. J., and ROSS, J., concur.