SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| KIRK ADAMS, Speaker of the Arizona House of Representatives, in his official capacity; and RUSSELL PEARCE, President of the Arizona Senate, in his official capacity, ) ) ) ) ) ) ) | Arizona Supreme Court No. CV-10-0405-SA |
| Petitioners, ) | |
| v. ) | **O P I N I O N** |
| THE COMMISSION ON APPELLATE COURT APPOINTMENTS; REBECCA WHITE BERCH, officially in her capacity as Chair of the Commission on Appellate Court Appointments; SUZANNE M. BALLARD; DOUG COLE; CAREY DOBSON; ROBERT M. GALLO; JOHN A. LEAVITT; LINDA MARTIN; DEWEY D. SCHADE; JANE C. STRAIN; JOHN THOMAS TAYLOR, III; CHARIE WALLACE; WILLIAM J. EKSTROM, JR.; JILL HARRISON; MICHAEL RUSING; and TED A. SCHMIDT, officially in their capacities as members of the Commission on Appellate Court Appointments, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Respondents. ) ) | |

Special Action

**JURISDICTION ACCEPTED; RELIEF GRANTED IN PART AND DENIED IN PART**
_____

ARIZONA HOUSE OF REPRESENTATIVES                    Phoenix
     By    Peter A. Gentala


And

ARIZONA STATE SENATE                                    Phoenix
     By   Gregrey G. Jernigan
Attorneys for Kirk D. Adams and Russell K. Pearce

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL              Phoenix
     By   Mary R. O'Grady, Solicitor General
          Mark D. Wilson, Assistant Attorney General
          Rex C. Nowlan, Assistant Attorney General
Attorneys for Commission on Appellate Court Appointments,
Rebecca White Berch, Suzanne M. Ballard, Doug Cole, Carey
Dobson, Robert M. Gallo, John A. Leavitt, Linda Martin,
Dewey D. Schade, Jane C. Strain, John Thomas Taylor, III,
Charie Wallace, William J. Ekstrom, Jr, Jill Harrison,
Michael Rusing, and Ted A. Schmidt

HARALSON MILLER PITT FELDMAN & MCANALLY PLC             Tucson
     By   Stanley G. Feldman

And

PERKINS COIE LLP                                       Phoenix
     By   Paul F. Eckstein
          Colin P. Ahler
          Amy C. Chang
Attorneys for Amici Curiae Lattie Coor, Paul Johnson,
Valley Citizens League, Phoenix and Arizona Latino
Research Enterprise

SHEILA SULLIVAN POLK, YAVAPAI COUNTY ATTORNEY          Prescott
     By   Jack H. Fields, Deputy County Attorney
Attorneys for Amicus Curiae Yavapai County Attorney

GORDON & REES, LLP                                     Phoenix
     By   Stephen W. Tully
Attorneys for Amici Curiae Jeff Flake, Trent Franks,
Benjamin Quayle, Paul Gosar, and David Schweikert
_____

**B A L E S**, Justice

¶1      This special action challenges the qualifications of three nominees to the Arizona Independent Redistricting Commission.  On January 19, 2011, we issued an order accepting jurisdiction and granting relief in part, stating that a written

opinion would follow.  This is that opinion.

## I.

¶2      In 2000, the voters approved Proposition 106, which amended the Arizona Constitution to require that a five-member Independent Redistricting Commission ("IRC") draw boundaries for congressional and state legislative districts after every decennial census.  The IRC must be constituted by February 28 of each year ending in one.  Ariz. Const. art. 4, pt. 2, § 1(3). No more than two Commission members may belong to the same political party.  *Id.*   In addition, during the three years preceding appointment,

> members shall not have been appointed to, elected to, or a candidate for any other public office, including precinct committeeman or committeewoman but not including school board member or officer, and shall not have served as an officer of a political party, or served as a registered paid lobbyist or as an officer of a candidate's campaign committee.

*Id.*

¶3      The Arizona Constitution directs that by January 8 of years ending in one, the Commission on Appellate Court Appointments ("Appointment Commission") shall nominate twenty-five persons to serve on the IRC, "with ten nominees from each of the two largest political parties in Arizona . . . and five who are not registered with either of the two largest political parties in Arizona."  *Id.* §§ 1(4), (5).

¶4      After the Appointment Commission has created its list

3

of twenty-five nominees, the highest ranking officer of the Arizona House of Representatives appoints one person from the list to serve on the IRC. *Id.* § 1(6). Appointments of the next three commissioners are then made from the list successively by the House minority leader, the highest ranking officer of the Arizona Senate, and the Senate minority leader. *Id.* The four commissioners chosen by the legislative leaders select the fifth, who cannot be a member of any party already represented on the IRC. *Id.* § 1(8).

¶5　　In September 2010, the Appointment Commission announced that it was accepting applications from persons interested in serving on the IRC. Seventy-nine people applied, including Mark Schnepf, Stephen Sossaman, and Paul Bender. Schnepf and Sossaman, both Republicans, reported on their applications that they serve as directors for irrigation districts. Schnepf is on the board for the New Magma Irrigation District; Sossaman is on the board for the Queen Creek Irrigation District. Bender, an independent, stated on his application that he serves as "Chief Judge of two Arizona tribal courts." Bender, a law professor at Arizona State University, serves as the Chief Justice of the Supreme Court of the Fort McDowell Yavapai Nation and the Chief Judge of the Court of Appeals of the San Carlos Apache Tribe.

¶6　　The Appointment Commission met on December 8, 2010, to

4

take public comment, obtain legal advice on eligibility questions, interview forty applicants, and select nominees. The committee selected twenty-five nominees, including Bender, Schnepf, and Sossaman. Two days later, Kirk Adams, Speaker of the House of Representatives, and Russell Pearce, President of the Senate, asked the Appointment Commission to reconsider, arguing that the three contested nominees were ineligible because they held public office. The two legislators notified Bender, Schnepf, and Sossaman that they would not consider appointing them and urged them to withdraw. Bender declined; Schnepf and Sossaman sent withdrawal letters to the Appointment Commission.

¶7        On December 29, 2010, the Appointment Commission declined to change its selections and transmitted its list of twenty-five nominees to Adams. The next day, Adams and Pearce filed a petition for special action with this Court, arguing that the three challenged nominees are ineligible because they hold other public office and that Schnepf and Sossaman are also ineligible because they have withdrawn their applications.

**II.**

¶8        "Our decision to accept jurisdiction of a special action is highly discretionary." *League of Ariz. Cities & Towns v. Martin*, 219 Ariz. 556, 558 ¶ 4, 201 P.3d 517, 519 (2009). In invoking this Court's jurisdiction, Petitioners allege that the

5

Appointment Commission has "failed to . . . perform a duty required by law as to which [it had] no discretion," Ariz. R.P. Spec. Act. 3(a), because it has not established a pool of twenty-five "persons who are willing to serve on and are qualified for appointment" to the IRC. *See* Ariz. Const. art. 4, pt. 2, § 1(5).

¶9    We agree that Petitioners, as the persons entitled to make the first and third appointments to the IRC, have standing to challenge the legality of the Appointment Commission's list of nominees. *See Brewer v. Burns*, 222 Ariz. 234, 237-38 ¶¶ 11-14, 213 P.3d 671, 674-75 (2009). We exercise our discretion to accept jurisdiction because "this case involves a dispute at the highest levels of state government" requiring "a prompt determination." *Rios v. Symington*, 172 Ariz. 3, 5, 833 P.2d 20, 22 (1992).

### III.

### A.

¶10    Arizona's constitution states that "[w]ithin the three years previous to appointment," members of the IRC "shall not have been appointed to, elected to, or a candidate for any other public office, including precinct committeeman or committeewoman but not including school board member or officer." Ariz. Const. art. 4, pt. 2, § 1(3). Commissioners are also subject to a disqualification provision: "A commissioner, during the

commissioner's terms of office and for three years thereafter, shall be ineligible for Arizona public office or for registration as a paid lobbyist." *Id.* § 1(13).

¶11     The term "public office" as used in § 1(3) is not defined in the constitution.  The sentence in which the term appears, however, provides guidance as to its meaning.  Section 1(3) refers to "other public office" in contrast to service as an IRC commissioner, a state office, and "public office" therefore includes other state offices.  In addition, § 1(3) excludes school board members.  Because school districts are political subdivisions of the state, A.R.S. § 15-101(21) (2011), this exclusion implies that public offices of other political subdivisions (e.g., counties or municipalities) are encompassed by the term "public office" in § 1(3).  *Cf. State Consol. Publ'g Co. v. Hill*, 39 Ariz. 21, 28-32, 3 P.2d 525, 528-29 (1931) (holding that municipal officers are subject to prohibition in Article 4, Part 2, Section 17 on changes in compensation of "public officers" during term of office), *modified on other grounds*, 39 Ariz. 163, 4 P.2d 668 (1931).

¶12     Thus, "public office" as used in § 1(3) includes offices of the state or any of its political subdivisions, excluding school board members or officers.  *Cf.* A.R.S. § 38-101(1) (defining "office" to mean "any office . . . of the state, or any political subdivision thereof, the salary or

compensation . . . of which is paid from a fund raised by taxation or by public revenue").

**B.**

¶13    If an irrigation district director holds an "office" of a political subdivision of the state, Schnepf and Sossaman are ineligible to serve as commissioners.

¶14    Irrigation districts "derive their powers from the constitution and statutes of Arizona." *Hohokam Irr. & Drainage Dist. v. Ariz. Pub. Serv. Co.*, 204 Ariz. 394, 397 ¶ 6, 64 P.3d 836, 839 (2003).    Article 13, section 7 of the Arizona Constitution states that irrigation districts are "political subdivisions of the state, and vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under this constitution."    *See also* A.R.S. § 48-2901 ("All irrigation districts organized under the laws of this state are declared to be municipal corporations for all purposes.").

¶15    Irrigation districts are managed by elected boards of directors, who, along with a secretary appointed by the board, comprise the "officers" of the district.    A.R.S. §§ 48-2971. Although irrigation districts have business and economic purposes, rather than a solely governmental one, *Local 266, Int'l. Bhd. of Elec. Workers v. Salt River Project Agric. Improvement & Power Dist.*, 78 Ariz. 30, 42-43, 275 P.2d 393,

8

401-02 (1954), their activities are authorized by the constitution and by statute, and their business is of a public nature similar in some respects to certain statutorily authorized activities of cities and towns. *See* Ariz. Const. art. 2, § 34 (empowering municipal corporations "to engage in industrial pursuits"); A.R.S. § 9-511 (empowering cities and towns to engage in business of a public nature, such as operating a public utility). An irrigation district board of directors has broad powers to acquire and sell water and property, appropriate water and money, levy fines, and construct water and electrical delivery systems. A.R.S. § 48-2978.

¶16 Because irrigation districts are political subdivisions of the state and their "officers" include their directors, we conclude that Schnepf and Sossaman hold "public office" for purposes of § 1(3), just as officers of a city or a county hold public office. Notably, directors of irrigation districts take the same oath of office as county officials, *see* A.R.S. § 48-2973, -3023, and they are treated like county officers for purposes of recall. *See id.* § 48-3024 (permitting the recall of directors of irrigation districts and stipulating that the proceedings for such a recall follow what is "provided by the constitution and laws of the state for the recall of county officers").

¶17 Schnepf and Sossaman are therefore ineligible to serve

9

as IRC commissioners. We thus do not address Petitioners' argument that they are also ineligible because they are not willing to serve.

### C.

¶18    Bender is not an officer of the state or any of its political subdivisions. We assume, but need not decide, that he is an "officer" of the two tribes for which he serves as a part-time judge. Bender's eligibility turns on whether a tribal office is a "public office" under § 1(3) of the constitution.

¶19    Petitioners and the amici congressional representatives argue that "public office" must include more than offices of the state or its subdivisions, because the addition of the word "Arizona" before "public office" in the disqualification provision of § 1(13) would otherwise be superfluous. They also note that allowing members of Congress to serve as commissioners would conflict with Proposition 106's intent to remove self-interested officials from the process of drawing boundaries for their own electoral districts.

¶20    The meaning of "public office" cannot be identified without considering the context in which the term appears and the fact that, long before the adoption of § 1(3), the constitution had used the terms "public office" or "public officer" in several other provisions. *See Kilpatrick v. Superior Court (Miller)*, 105 Ariz. 413, 419, 466 P.2d 18, 24

10

(1970) (recognizing that "constitutions must be construed as a whole and their various parts must be read together"); *State ex rel. Jones v. Lockhart*, 76 Ariz. 390, 398, 265 P.2d 447, 452-53 (1953) (noting that "no constitutional provision is to be construed piece-meal, and regard must be had to the whole of the provision and its relation to other parts of the Constitution"). There is also force to the argument that "public office" as used in § 1(3)'s eligibility provision extends more broadly than the term "Arizona public office" as used in § 1(13)'s disqualification provision. We accordingly consider how the term "public office" has been interpreted in Arizona law before the adoption of Proposition 106.

¶21     The Enabling Act that resulted in Arizona's statehood provided for an initial election at which "officers for a full state government, including a governor, members of the legislature, one Representative in Congress, and such other officers as such constitutional convention shall prescribe, shall be chosen by the people." Act of June 20, 1910, ch. 310, § 23, 36 Stat. 557, 571. Consistent with this mandate, delegates at our state constitutional convention approved an ordinance providing that at the initial state election:

> [O]fficers for a full State government shall be chosen
> by the people, including all the elective State,
> County, and Precinct officers and members of the
> Legislature, provided for by said Constitution, and
> one Representative of Congress. For the purpose of

11

advising the Legislature, the people shall also express at said election, their choice for two United States Senators to represent the State in Congress.

Elec. Ord. No. 2, § 2.

¶22    Thus, on the eve of statehood, representatives to Congress were identified as among the "officers for a full state government."  (United States Senators were not directly elected until after the 1913 ratification of the Seventeenth Amendment.) Members of Congress are properly regarded as "officers for . . . a state," even though they are not state officers, inasmuch as they are chosen "by the People" of their respective states, and the vote of representatives may, in rare instances, be taken by state.  U.S. Const. art. 1, § 2, cls. 1-2; amend. XII (providing that vote of House of Representatives in selecting President shall be taken by state); amend. XVII (providing for direct election of senators).

¶23    The Arizona Constitution as drafted in 1910 and implemented in 1912 also contained several references to "public office."  Some of those references have long been understood to include Arizona's members of Congress.  For example, the constitution provides that "[w]hen any office shall, from any cause, become vacant, and no mode shall be provided by the Constitution or by law for filling such vacancy, the governor shall have the power to fill such vacancy by appointment." Ariz. Const. art. 5, § 8.  The inaugural state legislature

12

provided for the filling of certain vacancies, including those in Congress. *See* Rev. Stat. Ariz. Civ. § 2869 (1913) (providing that "[s]pecial elections to fill vacancies in the offices of members of the legislature, representatives in congress or United States senators shall only be held on the proclamation of the governor"); *id.* § 2870 (providing for interim appointment and election to fill unexpired Senate term upon vacancy).

¶24     Arizona's constitution also broadly declares in Article 8, Part 1, Section 1 that "[e]very public officer in the State of Arizona, holding an elective office . . . is subject to recall." Since statehood, Arizona has had statutory recall provisions directed at members of Congress. Rev. Stat. Ariz. Civ. § 22-3054 to -3364 (1913) (providing for advisory recall elections of members of Congress); A.R.S. §§ 19-221 to -222 (allowing members of Congress to file statements indicating their willingness to resign in response to a recall election).

¶25     Also relevant is Article 6, Section 28, of the Arizona Constitution, which provides that "[j]ustices and judges of courts of record shall not be eligible for any other public office or for any other public employment during their term of office." Before 1960, Article 6 stated that supreme court justices and superior court judges "shall not be eligible to any office or public employment" other than judicial office "during the term for which they shall have been elected." Ariz. Const.

13

art. 6, § 11 (repealed 1960).

¶26      In *Stockton v. McFarland*, a primary candidate argued that this provision rendered his opponent, a superior court judge, ineligible for the United States Senate. 56 Ariz. 138, 139-40, 106 P.2d 328, 328 (1940). The opponent, Ernest McFarland, responded by arguing that the reference to "any office" concerned solely state offices and, in any event, the state could not add to qualifications established by the federal Constitution for Senators. Evidently assuming that "any office" as used in article 6 would include United States Senators (the Court did not address the contrary argument), the Court accepted McFarland's alternative argument, holding that the federal Constitution bars states from altering the qualifications for members of Congress. *Id.* at 147-48, 106 P.2d at 331.

¶27      Arizona's legislature has also repeatedly enacted statutes suggesting, at least implicitly, that members of Congress are regarded as holding public office. For example, the state requires the filing of financial disclosures by "public officers." A.R.S. § 38-541(8). Members of Congress are specifically excluded, suggesting that they might otherwise be regarded as "public officers." *Id.* Similarly, although Arizona law broadly requires campaign finance disclosures for candidates for public office, candidates for federal office are specifically excluded. A.R.S. § 16-901(2) (excluding candidates

14

for federal office from state campaign disclosure law).

¶28    Arizona law, we acknowledge, is not entirely consistent in its use of the terms "office," "public office," and "public officer."  Sometimes the constitution expressly distinguishes between federal and state offices.  *See, e.g.*, Ariz. Const. art. 4, pt. 2, § 4 (providing that, with certain exceptions, "[n]o person holding any public office of profit or trust under the authority of the United States, or of this state, shall be a member of the legislature"); *id.* § 5 (providing, with certain exceptions, that legislators during their term "shall [not] be eligible to hold any other office or be otherwise employed by the state of Arizona or, any county or incorporated city or town thereof"); *id.* art. 22, § 18 (providing that, "[e]xcept during the final year of the term being served, no incumbent of a salaried elective office . . . may offer himself for nomination or election to any salaried local, State or federal office").

¶29    The legislature has also sometimes interpreted the constitution's use of the term "public office" as referring only to offices of the state and its political subdivisions.  When the constitution was ratified, Article 7, Section 16 directed the legislature, during its first session, to adopt a law providing for the disclosure of "all campaign contributions to, and expenditures of . . . candidates for public office."  The

15

1912 statute adopted in response required financial disclosures from "candidate[s] for election . . . to any state, county, city, or town office."  Rev. Stat. Ariz. Civ. § 3054 (1913). The statute did not mention any disclosures from candidates for federal office.

¶30    Arizona law, however, has sometimes treated members of Congress as holding "public office."  Given this backdrop, we agree with Petitioners and the amici representatives that Arizona's members of Congress hold "public office" under § 1(3) and thus are ineligible for service on the IRC.  This conclusion recognizes the evident purpose of § 1(3) to prevent self-interested officials from drawing the boundaries of their own electoral districts.  *Cf*. Ariz. Const. art. 4, pt. 2, § 1(15) (directing that "places of residence of incumbents or candidates shall not be identified or considered").

¶31    Our interpretation of § 1(3) also recognizes the difference between its language and § 1(13)'s reference to "Arizona public office."  Although Arizona may exclude members of Congress or other federal officeholders from serving on the IRC, § 1(13) recognizes that the state has no power to disqualify candidates from serving in federal office or offices created by other sovereign entities.  *See State ex rel. Pickrell v. Senner*, 92 Ariz. 243, 246-47, 375 P.2d 728, 729-30 (1962); *see also U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 783

16

(1995); *State v. Osborne*, 14 Ariz. 185, 207, 125 P. 884, 893-94 (1912) (recognizing power of Congress to fix time for election of representatives contrary to state constitution); Op. Ariz. Att'y Gen. I07-011, 2007 WL 4401306 (Dec. 5, 2007) (concluding that §1(13) applies only to Arizona state and local offices given different phrasing in § 1(3) and because state cannot add to qualifications for federal office).

**D.**

¶32    Our conclusion that members of Congress hold "public office" for purposes of § 1(3) does not, however, resolve whether Bender, a tribal judge, holds a public office. Is a *tribal* office a *public* office under § 1(3)?

¶33    Petitioners argue that a tribal judgeship is a "public office" because the term generally refers to a position in which a person exercises a government's sovereign powers and Indian tribes are sovereign entities. Citing dictionary definitions of "public office," the dissent similarly argues that § 1(3) should be construed broadly to include tribal officers.

¶34    These arguments are not persuasive because they seek to interpret "public office" without considering the context in which it appears within § 1(3) and the way in which this phrase has otherwise been interpreted under Arizona law. As Justice Scalia has observed, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning

17

of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States,* 508 U.S. 129, 132 (1993). The same proposition applies in construing our constitution. *See Corp. Comm'n v. Pac. Greyhound Lines*, 54 Ariz. 159, 170, 94 P.2d 443, 447 (1939) (observing that constitutional provisions must be construed in light of the 'instrument as a whole"); *cf. NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2nd Cir. 1941) (L. Hand, J.) (noting that "[w]ords are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used").

¶35    Indian tribes are not, of course, political subdivisions of the state. Instead, Indian tribes have been recognized since the ratification of the United States Constitution as having a special sovereign status separate from the federal government and the states. *Cf.* U.S. Const. art. I, § 8, cl. 3 (granting Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"). "Indian tribes retain attributes of sovereignty over both their members and their territory, to the extent that sovereignty has not been withdrawn by federal statute or treaty." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987) (citation and internal quotation marks omitted).

18

¶36    Consistent with the tribes' distinctive status, Arizona's constitution and laws generally do not include tribes within the meaning of the word "public." *Cf.* Ariz. Const. art. 20, § 4 (referring separately to "public lands" and "lands . . . owned or held by . . . Indian tribes"). As noted above, *see supra* ¶¶ 23-29, Arizona's constitution and statutes refer in many places to public office or public officers (for example, in provisions governing recall or financial disclosure), but none of those provisions has been construed to embrace tribal offices. Indeed, at oral argument, counsel could not identify any instance in Arizona law in which the word "public" has been interpreted to refer to Indian tribes.

¶37    Petitioners and the congressional amici also contend that a tribal judge is a "public officer" under the test adopted in *Winsor v. Hunt*, 29 Ariz. 504, 520-21, 243 P. 407, 413 (1926). *Winsor* concerned a constitutional prohibition on state legislators being appointed or elected during their term to "any civil office of profit under this State" created during their term. (This provision was later replaced by a 1938 amendment adopting the language now in Article 4, Part 2, Section 5.) The Court concluded that the prohibition applied to "public officers" but not mere "employees." *Winsor*, 29 Ariz. at 517, 243 P. at 412.

¶38    Recognizing that "[t]here is no entirely satisfactory

definition" of public office, *id.* at 518, 243 P. at 412, the Court in *Winsor* said a position is presumably an office, rather than employment, if (1) the specific position is created by law, (2) there are "definite duties imposed by law on the incumbent," and (3) the duties "involve the exercise of some portion of the sovereign power." *Id*. at 520-21, 243 P. at 413.

¶39    *Winsor* is inapposite.   It construed a since-replaced constitutional provision and did not purport to adopt a general definition of "public office."  But most importantly, *Winsor* did not concern whether an individual held a "public" position (Winsor indisputably worked for the state), but instead whether the person was an officer rather than an employee.  Although we do not question *Winsor*'s criteria for identifying when a position created by state law qualifies as an "office of profit under this State," or that those criteria might provide useful guidance in other contexts, *cf. McCarthy v. State ex rel. Harless*, 55 Ariz. 328, 336, 101 P.2d 449, 452 (1940) (observing that position on a county welfare board was an "office" under *Winsor* in construing statute concerning eligibility to serve as county supervisor), we decline to use them to define "public office" for purposes of § 1(3).

¶40    In arguing that "public office" as used in § 1(3) includes tribal judges, Petitioners also contend that Indian tribes are "communities of interest" affected by redistricting

20

and that allowing tribal officers to serve as commissioners would undermine the goals of promoting impartiality and public confidence in the redistricting process. These arguments are not compelling. Section 1(3) does not exclude persons from service as commissioners merely because they may be associated with some group characterized as a community of interest. Indeed, § 1(3) does not exclude many persons who might be regarded as potentially interested or biased in the redistricting process, such as relatives or staff members of incumbents or prospective candidates.

¶41　　Moreover, we are confident that the Appointment Commission will carefully exercise its constitutional responsibility to identify nominees who are committed to serving "in an honest, independent and impartial fashion and to upholding public confidence in the integrity of the redistricting process." Ariz. Const. art. 4, pt. 2, § 1(3). Here, there is no reason to question the Appointment Commission's conclusion that Bender, despite his service as a tribal judge, could serve impartially and uphold public confidence in the integrity of the process.

¶42　　Before § 1(3) was adopted, the Arizona Constitution had referred to "public office" or "public officers" in a half dozen places, none of which was ever construed to include tribal officers. As noted above, no legal authority identified by the

21

parties or this Court has interpreted a state law referring to "public office" as including tribal offices absent a specific statutory reference to Indians or tribes. For this Court to construe § 1(3) as including tribal offices would thus constitute a unique and unprecedented interpretation of the phrase "public office." Since statehood, this Court has declined to construe provisions restricting eligibility for public office more broadly than the constitution's text requires. *See Steeves v. Wilson*, 14 Ariz. 288, 290, 127 P. 717, 717-18 (1912) (concluding that although Article 7, Section 15 requires office holders to be qualified electors, it does not require that they vote at election held to fill the office). We decline to do so again today.

¶43    Because § 1(3) contains no language indicating that its proscription on commissioners holding "other public office" extends to Indian tribes, we hold that the position of tribal judge is not a "public office" for purposes of § 1(3).

## IV.

¶44    For the reasons stated, we accepted jurisdiction and granted relief in part. Because Schnepf and Sossaman are ineligible to serve as commissioners, we ordered the Appointment Commission promptly to identify two alternative nominees so that Adams could appoint the initial commissioner from a pool of twenty-five qualified nominees. Petitioners' request for relief

22

was denied as to Bender because his position as a tribal judge does not render him ineligible to serve as a commissioner.

_____
W. Scott Bales, Justice

CONCURRING:


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
Michael D. Ryan, Justice (Retired)

**B R U T I N E L**, Justice, dissenting in part

¶45    I concur with the majority's result concerning Schnepf and Sossaman, but respectfully dissent from its analysis of the phrase "any other public office" as used in Article 4, Part 2, § 1(3) of the Arizona Constitution, as well as its analysis of Professor Bender's eligibility for service on the IRC.  A straightforward reading of the constitutional provisions at issue reveals a clear, unambiguous intent to broadly curtail the influence of the politically entrenched and politically ambitious on that Commission's work and decisions. *See Carrow Co. v. Lusby*, 167 Ariz. 18, 20-21, 804 P.2d 747, 749-50 (1990) (in interpreting a law, court examines its language and considers underlying policy and "the evil it was designed to

23

remedy"). In my view, the majority's limited application of the term "public office" could undermine that intent and fails to yield an easily understood, workable standard. Moreover, its construction has the unacceptable practical effect of replacing the word "any" in § 1(3) with the word "some," a reading inconsistent with that provision's actual, broad language. *See Phelps v. Firebird Raceway, Inc.*, 210 Ariz. 403, 407-08 ¶¶ 18-19, 111 P.3d 1003, 1007-08 (2005) (finding broadly worded constitutional provision did not support narrow construction); *see also Backus v. State*, 220 Ariz. 101, 106 ¶ 22, 203 P.3d 499, 504 (2009) (declining to engraft term not included in statute).

¶46 In promoting the proposed constitutional amendment to establish the membership of the IRC, proponents of Proposition 106 said it would create "an independent commission of balanced appointments to oversee the mapping of fair and competitive congressional and legislative districts," Ariz. Sec'y of State 2000 Publicity Pamphlet 60 (2000). To further that objective, the broadest possible restrictions were placed on potentially interested parties. No person on the IRC may hold or be a candidate for "any other public office" in the three years preceding appointment. § 1(3). And at the conclusion of their service, IRC members are further barred from seeking any "Arizona public office" for three years. § 1(13).

¶47 As the majority recognizes, *see supra*, ¶¶ 20, 31, and

24

as the Arizona Attorney General's Office has opined, these are not symmetrical restrictions. *See* 2007 Op. Ariz. Att'y Gen. I07-011, 2007 WL 4401306 (Dec. 5, 2007) (noting difference in language between §§ 1(3) and 1(13), and concluding that latter provision covers only Arizona public offices (state or local), but not federal offices "because the State cannot add to the qualifications for federal office"). The eligibility restriction in § 1(3) for appointment to the IRC is broader than the post-service restriction in § 1(13) because the state has the power to impose the former. *See Whitney v. Bolin*, 85 Ariz. 44, 47, 330 P.2d 1003, 1004 (1958) (Arizona Constitution may prescribe exclusive, controlling qualifications for state officials).

¶48    Conversely, Arizona may exercise significantly less authority over the prospective actions of former IRC members, and none at all over other sovereign entities. *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 783 (1995); *Pickrell v. Senner*, 92 Ariz. 243, 246, 375 P.2d 728, 729 (1962). Such limitations would impermissibly infringe on those entities' sovereign ability to define their own qualifications for public office.[1]

---

[1] A significant portion of the majority opinion is devoted to deciding whether a member of Congress is a "public officer" under the Arizona Constitution. That question, while no doubt important, is not before this Court. But given the breadth of

25

¶49 Reading §§ 1(3) and 1(13) together, the specific limitation in § 1(13) on a former member's seeking an "Arizona" public office is not intended to limit the applicability of the general disqualification of "any" public office holder in § 1(3). *See State Comp. Fund v. Superior Court (EnerGCorp, Inc.)*, 190 Ariz. 371, 375, 948 P.2d 499, 503 (App. 1997) ("The provision of one exemption in a statute implicitly denies the existence of other unstated exemptions.") (citing *State v. Roscoe*, 185 Ariz. 68, 71, 912 P.2d 1297, 1300 (1996) ("[T]he expression of one or more items of a class indicates an intent to exclude all elements of the same class which are not expressed.")). If possible, therefore, the phrase "public office" should be given a meaning consistent with the unqualified terms used in § 1(3) to determine who exactly is ineligible to serve on the IRC.

¶50 As noted, § 1(3) broadly disqualifies persons who have, in the last three years, held or been a candidate for "any other public office." There is no express or implied exemption for a tribal position.[2] On the contrary, a perusal of legal and

---

the phrase "any other public office" in § 1(3), it clearly would encompass members of Congress and render them ineligible for service on the IRC.

[2] Accordingly, I disagree with the majority's position that the exclusion of school board members from the ambit of this provision "provides guidance as to its meaning." *See supra*, ¶ 11. The exclusion of school board members from this provision

general dictionary definitions confirms that "public office" includes the office of any government and is not limited to a specific type of sovereign. *See Brewer v. Burns*, 222 Ariz. 234, 239-40 ¶ 27, 213 P.3d 671, 676-77 (2009) (consulting dictionaries to determine ordinary usage of terms). General use dictionaries define public officer as "a person who has been legally elected or appointed to office and who exercises governmental functions." Merriam Webster's Collegiate Dictionary Eleventh Edition 1006 (2003); *accord* Webster's 9th New Collegiate Dictionary 952 (1983). Black's Law Dictionary similarly defines "public office" as "[a] position whose occupant has legal authority to exercise a government's sovereign powers for a fixed period." Black's Law Dictionary 1348 (9th ed. 2008). It further defines "public" as "[r]elating or belonging to an entire community, state, or nation," and "public official" as "[o]ne who holds or is invested with a public office; a person elected or appointed to carry out some portion of the government's sovereign powers." Because these terms do not contain any express or implied exclusions for

---

merely suggests that "any . . . public office" means just that— any public office. Moreover, the drafters' choice to expressly exclude a specific office tends to support a broad construction of the phrase "public office." In any event, the text does not contain any other express limitations on the term, and we should decline to limit it any further. *See State Comp. Fund*, 190 Ariz. at 375, 948 P.2d at 503.

officers of Indian tribes, we should afford the phrase "any other public office" its unqualified, broad meaning.

¶51    Giving the term "public office" the broad construction that § 1(3) suggests, I would conclude that Bender, as chief justice of two tribal courts, holds public office. At oral argument, amicus Valley Citizens' League's counsel (advocating for Professor Bender's eligibility) expressly stated that Bender is a public officer of the respective tribes he serves. The constitutions and bylaws of both the San Carlos Apache and Fort McDowell Yavapai tribes support this acknowledgement, expressly delegating the judicial authority of their respective nations to their judiciaries. And it is indisputable that the judicial powers of a tribal nation are governmental powers of a sovereign. *See* 25 U.S.C. § 3631 (2006) (recognizing inherent sovereign authority of each tribal government's judiciary); *Penn v. United States*, 335 F.3d 786, 789 (8th Cir 2003) ("[A] tribal court judge is entitled to the same absolute judicial immunity that shields state and federal court judges."). As a judge, therefore, Bender exercises a portion of the governing power of these two sovereigns, making him a public official of these tribes.[3]

---

[3] In response to a question in the IRC application that asked about "elected or appointed offices" the applicant had held, Professor Bender described his tribal judge positions with two Indian nations and said his judicial role was "essentially the

28

¶52     Appropriately, the majority looks to the constitution and Arizona statutes to determine if the term "public office" has a particularized, consistent meaning under Arizona law and concludes that it does not. *See supra*, ¶¶ 28-30.  Also understandably, the majority declines to simply adopt a definition used elsewhere in Arizona law to construe § 1(3), noting that "public office" has not been consistently interpreted throughout Arizona law.  But the majority then rejects any applicable or relevant principles derived from *Winsor v. Hunt*, 29 Ariz. 504, 243 P. 407 (1926), which provides a logical framework for analyzing the issue, albeit in a different context. *Cf. Inquiry Concerning Complaint of Judicial Standards Comm'n v. Not Afraid*, 245 P.3d 1116, 1119 (Mont. 2010) (using definition similar to *Winsor* analysis to determine whether tribal judge was a public officer).

¶53     The majority's unwillingness to adopt a definition of the term "public office" skews its analysis of Bender's eligibility for service.  Without a definition, the majority correctly attempts to look to the context in which the term "public office" appears. *See supra*, ¶ 20.  But what it claims is constitutional context appears to be mere constitutional silence.  The majority cites only a section of the Arizona

---

same as the role of federal judges with respect to the federal government."

29

Constitution that refers separately to "public lands" and "Indian lands." *See supra*, ¶ 38. Article 20, Section 4, however disclaims the people's right to appropriate as personal property any ungranted public lands within the border of the state and lands granted specifically to Indian tribes.[4] This provision does not appear to support the general proposition that Indian tribes are not considered part of the public. Moreover, even if it clearly separated Indian tribes from "public," this would not be binding on our interpretation, particularly in light of the unqualified language in § 1(3) and the intent to broadly restrict political manipulation of the redistricting process. *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (explaining that the presumption that identical words in the same statute have the same meaning gives way when the context reflects they were employed with a different intent).

---

[4] Article 20, § 4 states in its entirety:
> The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof and to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that, until the title of such Indian or Indian tribes shall have been extinguished, the same shall be, and remain, subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States.

¶54    The majority also points out that "Arizona's constitution and statutes refer in many places to public office or public officers . . . but none of those provisions has been construed to embrace tribal offices." *Supra*, ¶ 38. That point, although correct, is neither surprising nor helpful to the majority inasmuch as the issue presented here has never been raised or decided before. Absent any controlling or pertinent authority, giving the unqualified phrase "any other public office" in § 1(3) a fair and rational interpretation, so as to include within its broad sweep tribal offices, is no more "unique and unprecedented" than the majority's contrary holding, particularly considering the overarching purpose of Proposition 106. *See supra*, ¶ 42.

¶55    In short, the majority's observation provides no constitutional or statutory support for excluding tribal offices from the broad category of public office. In fact, the same absence of authority supports including them within this category because no law or case has expressly excluded tribal officers. The most logical reading of constitutional language affords a broad meaning to broad words unless expressly narrowed, not a narrow meaning unless expressly broadened.[5] *See*

_____

[5] Although I agree with the majority that this Court declines to construe restrictions on public office more broadly than the text supports, *see Steeves v. Wilson*, 14 Ariz. 288, 290, 127 P. 717,

31

*State ex rel. La Prade v. Cox*, 43 Ariz. 174, 177-78, 30 P.2d 825, 826-27 (1934) ("[B]ecause constitutions are for the purpose of laying down broad general principles, and not the expression of minute details of law, their terms are to be construed liberally, for the purpose of giving effect to the general meaning and spirit of the instrument . . . .").

¶56        Moreover, this Court should be hesitant to infer too much from Arizona law failing to expressly refer to Indian tribes.  Because states have limited authority to bind tribes, *see Ramah Navajo Sch. Bd. v. Bureau of Rev. of New Mexico*, 458 U.S. 832 (1982), it is unsurprising that our laws contain few references to tribes.  This relative silence makes apparent what is obviously true about Indian tribes:  the State of Arizona does not have the authority to govern them as it does its own political subdivisions.

¶57        Section 1(3) is framed very broadly, has no surrounding subsections that suggest a qualified or limiting construction, and, as a constitutional provision enacted through voter initiative, has no instructive legislative history. Accordingly, it should be given the broad meaning the language dictates.

¶58        Like the majority, and as the Commission on Appellate

_____

718 (1912), here the text supports and, in fact, demands a broad restriction.

32

Court Appointments implicitly determined, I have no doubt that Professor Bender would exercise a position on the IRC "in an honest, independent and impartial fashion" and would "uphold[] public confidence in the integrity of the redistricting process." Ariz. Const. art. 4, pt. 2, § 1(3). But that is not the issue. I am similarly convinced that Mr. Schnepf and Mr. Sossaman would exercise their duties equally professionally, honestly, and diligently. But our constitution categorically excludes certain people from service on the IRC. Regardless of our convictions about the sincerity and merit of any given candidate, our duty is to give effect to the constitution as written. Because the more reasonable interpretation of the phrase "any other public office" in § 1(3) includes tribal officers (as well as many other government posts, regardless of the employing sovereign), I respectfully dissent from the portion of the majority opinion that concludes otherwise.

_____
Robert M. Brutinel, Justice

CONCURRING:

_____
A. John Pelander, Justice

33