IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

RACHEL WALDEN, et al., *Plaintiffs/Appellants*,

*v.*

MESA UNIFIED SCHOOL DISTRICT #4, et al., *Defendants/Appellees.*

No. 1 CA-CV 24-0776

FILED 12-30-2025

Appeal from the Superior Court in Maricopa County
No. CV2023-018263
The Honorable Danielle J. Viola, Judge

**AFFIRMED IN PART, VACATED IN PART; REMANDED**

COUNSEL

America First Legal Foundation, Washington, D.C.
By James K. Rogers
*Counsel for Plaintiffs/Appellants*

Gust Rosenfeld P.L.C., Phoenix
By Charles W. Wirken and Robert D. Haws
*Counsel for Defendants/Appellees*

---

**OPINION**

Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Anni Hill Foster and Judge Paul J. McMurdie joined.

---

**B R O W N**, Judge:

¶1        Jane Doe (a pseudonym), a parent of a student enrolled in Mesa Unified School District #4, colloquially known as Mesa Public Schools ("MPS"), and Rachel Walden, a member of MPS's governing board ("Board"), appeal the superior court's order dismissing their first amended complaint ("Complaint") against MPS and superintendent Andi Fourlis.  In this opinion, we focus primarily on Doe's declaratory judgment claims alleging, *inter alia*, violations of Arizona's Parents' Bill of Rights ("PBOR"), which authorizes parents to sue government entities and officials for usurping or interfering with fundamental parental rights.  *See* A.R.S. § 1-602.  Broadly stated, Doe claimed that MPS violated the PBOR and other statutes by failing to inform her about her child's sexual and gender identity issues.  We affirm the court's order dismissing Walden's claims and dismissing Fourlis as a defendant, but we vacate the rest of the court's order.

**BACKGROUND**

¶2        MPS hired Fourlis in 2020.  As the superintendent, she is responsible for preparing administrative regulations to implement the policies established by the Board.  Walden was elected to the Board in November 2022 and took office on January 1, 2023.

¶3        In 1980, to comply with Title IX of the Federal Education Amendments of 1972, MPS adopted a general policy prohibiting sex-based discrimination.  *See* 20 U.S.C.A. § 1681(a), (c).  To ensure "equal access to . . . school[] education[al] programs and activities," MPS established "Guidelines for Support of Transgender and Gender Nonconforming Students" ("Guidelines") to protect such students from discrimination and harassment.  One or more versions of the Guidelines have been in place since at least 2015.

¶4        The Guidelines outline how to "provide support" to "a student [who is] transgender or gender nonconforming and consistently

asserts at school a gender identity that is different from the student's sex assigned at birth." The version of the Guidelines in place during the 2022–23 school year included definitions of relevant terms and explanations of district policies addressing discrimination, harassment, privacy, and how to update a student's name or gender in the electronic student information system ("Synergy"). MPS also maintained two forms designed to be completed with the student—a checklist and a support plan—detailing how school staff could best address a particular student's needs.

¶5         The 2022–23 support plan included the following notice: "Parents/guardians will be notified if the student requests changes to Synergy." Absent a request for a name or gender change in Synergy, the support plan does not require parental notification that a student has completed a support plan. Emphasizing students' right to privacy, the support plan mandates that "[s]chool staff shall not disclose information that may reveal a student's transgender status or gender nonconforming presentation to others except as set forth on this form." Students could mark whether their gender identity could be shared with various groups, including "[s]chool leadership/administration," "[t]eachers and/or other school staff," or "[o]pen to all adults and peers." As of the filing of the Complaint, "MPS still uses the support plan at all schools."

¶6         Walden sued MPS and Fourlis ("Defendants," except as otherwise noted) in November 2023, alleging the Guidelines violated multiple statutes, including the PBOR, and the Board had never voted to adopt the Guidelines. Doe joined as a plaintiff on February 9, 2024. The lengthy Complaint includes the following allegations.

¶7         In October 2022, Doe learned that her child, a biological female named Megan (a pseudonym) was using the name Michael (a pseudonym) at the child's junior high school. In November, Doe contacted a teacher to ask about her child's name. Initially, the teacher declined to answer and directed Doe to speak with the principal but later confirmed that Megan "was known as Michael to all teachers and students at the school."

¶8         Doe attended a meeting with the school principal on December 5, 2022, which Doe describes in part as follows:

> [T]he principal confirmed that the school knew that Megan used "Michael" as her chosen name and that the school allowed and encouraged this. The principal further informed [Doe] that the reason for the name change was Megan's

uncertainty about her sexual and gender identity, that Megan had asked that she go by the name of "Michael" at school, and that this request had been conveyed to all of Megan's teachers.

. . .

The principal told [Doe] that when a student went by a nickname or other name different from her given name, MPS's student information system allowed the school to input the student's preferred name into [Synergy]. The principal also informed [Doe] that any such change made to the student information system would trigger an automatic alert to the student's parents and that if the school had changed Megan's preferred name to Michael in their electronic system, [Doe] would have been made aware of the name change.

The principal admitted that school personnel intentionally had not changed Megan's name in [Synergy] to avoid any notification being sent to [Doe] and that there were no plans to change Megan's name in [Synergy]. The principal told [Doe] that even if [she] had asked to be notified about any name changes, pronoun changes, or other choices related to a transgender identity by her child, it was official MPS policy not to tell parents and that school personnel would not notify [Doe] about any further developments related to these issues.

¶9 According to Doe, the principal did not further disclose to Doe "the content of Megan's discussions with the principal or other school personnel about gender and sexuality issues." Doe further alleged she

has been unable to obtain any records or information from the school that disclose the specific content of the discussions school personnel had with Megan about gender and sexuality. The principal and other school personnel appear to consider information about their discussions with Megan on gender and sexuality to be confidential, even as to Megan's parents. They have treated [Doe] as if they believe she does not have the right to know this information.

¶10 At the December 2022 meeting, Doe requested "that all school personnel stop[] using the name 'Michael' and instead refer[] to Megan by her given name." The principal directed Doe to contact MPS's general

counsel if she wished to discuss the matter further. Doe called the general counsel and left a message but received no return call.

¶11 On February 9, 2023, Doe and Megan's father attended a meeting with most of Megan's teachers to discuss certain educational services. However, contrary to their earlier demand made to the principal, Megan's parents discovered that only one teacher referred to Megan by her given name, with the rest using the name Michael. Both parents "expressed their anger and frustration that school personnel had hidden Megan's in-school gender transition."

¶12 Doe also alleged that MPS's implementation of the Guidelines regarding Megan was dangerous, harmful, and unlawful for several reasons, including the following:

> [S]chool employees encouraged Megan to lie to her parents and helped her to do so, which harmed the parent-child relationship and delayed Megan from receiving needed mental health counseling. Following the December 5, 2022 meeting with the principal, [Doe] became more completely aware of Megan's struggles. Consequently, [Doe] was able to talk to Megan with love and empathy about these issues and discuss how to resolve them. Furthermore, this led to Megan talking to her psychotherapist about these issues as well.

> Within a month of [Doe]'s meeting with the principal and Megan being able to talk to her mother and mental health counselor, Megan's issues were completely resolved. Within a month, [Megan] no longer needed counseling. [Megan] is now very comfortable presenting herself as a female and using her given name and is thriving in high school.

> If MPS employees had immediately contacted [Doe]—as required by law—when Megan first expressed concerns about her sexual and gender identity, she could have had those important discussions with her mother and her mental health counselor sooner and avoided many months of needless suffering. She also would have avoided the difficulty and hardship of de-transitioning back to presenting as a female and using the name "Megan" again.

¶13 Walden and Doe ("Plaintiffs," except as noted) alleged MPS violated several statutes, including (1) the PBOR, which establishes "[t]he liberty of parents to direct the upbringing, education, health care and

mental health of their children" without interference from any governmental entity, A.R.S. § 1-601(A); (2) the prohibition on public employees making "[a]ny attempt to encourage or coerce a minor child to withhold information from the child's parent[s]," A.R.S. § 1-602(C); (3) the requirement that schools ensure that parents "will be notified in advance of and given the opportunity to opt their children in to any instruction, learning materials or presentations regarding sexuality, in courses other than formal sex education curricula," A.R.S. § 15-102(A)(6); and (4) the prohibition on mental health screening or mental health treatment without parental consent, A.R.S. § 36-2272(A). Plaintiffs therefore requested, *inter alia*, a judgment declaring the Guidelines unlawful.

**¶14** Plaintiffs also asked for an injunction and/or writ of mandamus ordering MPS and Fourlis to (1) revoke the Guidelines, (2) institute a policy to ensure that school employees do not secretly continue to implement the Guidelines, (3) abstain from imposing any policies or procedures about gender or sexual identity unless lawfully approved by the Board, and (4) contact all parents whose children were affected by the Guidelines.

**¶15** Defendants moved to dismiss the Complaint for failure to state a claim upon which relief could be granted. *See* Ariz. R. Civ. P. 12(b)(6). As pertinent here, Defendants asserted that (1) Walden and Doe lacked standing, (2) Doe's complaint was untimely, (3) Fourlis was not a proper defendant, (4) a declaratory judgment was not an available remedy, and (5) pursuit of relief through a special action was improper. After briefing and oral argument, the superior court granted MPS's motion, finding that Plaintiffs lacked standing "to bring the present claims," Doe's claims were untimely, the Complaint was not a proper special action, and Plaintiffs failed to state a claim for declaratory relief. The court noted it was not addressing "whether MPS's practices are lawful or whether immunity applies." Walden and Doe timely appealed, and we have jurisdiction under A.R.S. §§ 12-120.21(A)(1), -2101(A)(1).

## DISCUSSION

**¶16** We review the superior court's ruling on a motion to dismiss de novo and assume "the truth of all well-pleaded factual allegations and indulge all reasonable inferences from those facts." *Coleman v. City of Mesa*, 230 Ariz. 352, 355–56, ¶¶ 7–9 (2012). We also review issues of standing and mootness de novo as issues of law. *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 279, ¶ 34 (2019).

**¶17** Plaintiffs attached various documents to the Complaint, including the Guidelines, checklist, support plan, and email correspondence. MPS's motion to dismiss included several sections from its Board's policies. Because neither party has argued the court erred in failing to convert this matter to a motion for summary judgment, we consider these documents in resolving this appeal, viewing them in the light most favorable to Plaintiffs. *See* Ariz. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or (c), matters outside the pleadings are presented to, and not excluded by, the court, the motion must be treated as one for summary judgment under Rule 56.").

## I. Standing

**¶18** Unlike the United States Constitution, "the Arizona Constitution lacks a 'case or controversy' requirement, which is the foundation of the standing doctrine." *Montenegro v. Fontes*, __ Ariz. __, __, ¶ 17, 576 P.3d 692, 697 (2025). Thus, "standing is a prudential consideration rather than a mandatory prerequisite to suit." *Id*. at ¶ 18. But we "exercise restraint" to ensure that we "refrain from issuing advisory opinions, that cases be ripe for decision and not moot, and that issues be fully developed between true adversaries." *Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, 523, ¶ 12 (2021) (citation modified). "For purposes of determining standing, we assume that the plaintiffs are correct on the merits, although that is not a binding or even preliminary determination." *Montenegro*, 576 P.3d at 697, ¶ 19 (citation omitted). We also recognize that standing may exist based on statutory provisions pertinent to the issues in a particular case. *See Welch*, 251 Ariz. at 523, ¶ 12 ("Standing may be conferred by a statute."); *see also Fay v. Fox*, 251 Ariz. 537, 541, ¶ 21 (2021) (explaining that the victim rights statute "expressly and very broadly confers standing upon a victim to be heard in a matter that is directly traceable to those rights").

### A. Doe's Standing

**¶19** The superior court concluded that Doe lacks standing because her Complaint "alleges a concern at her child's prior school that has been completely resolved" and thus Doe failed to allege a "current case or controversy." MPS relies on the superior court's reasoning, asserting the case is moot because Doe cannot properly assert claims for declaratory relief under the PBOR given that her rights were no longer affected when she joined the action. As explained below, whether Megan's concerns had been "completely resolved" when Doe filed the Complaint is not dispositive because Doe's standing to sue turns on whether she properly

alleged claims for relief under the statutes cited in the Complaint, including the PBOR.

¶20 The PBOR, adopted by the legislature in 2010, provides that "[t]he liberty of parents to direct the upbringing, education, health care and mental health of their children is a fundamental right," and a governmental entity "shall not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." A.R.S. § 1-601(A), (B); 2010 Ariz. Sess. Laws, ch. 307, § 1 (2nd Reg. Sess.) (S.B. 1309). As pertinent here, the PBOR mandates that "[a]ll parental rights are exclusively reserved to a parent of a minor child without obstruction or interference from" any governmental entity, including the right to (1) "direct the education of the minor child," (2) "access and review all records relating to the minor child," (3) direct the child's "upbringing" and "moral or religious training," and (4) make "health care decisions." A.R.S. § 1-602(A)(1)-(5). In 2022, the legislature amended § 1-602 to add subsections (E)–(G), which authorize parents to sue for violations of the PBOR. 2022 Ariz. Sess. Laws, ch. 200, § 1 (2nd Reg. Sess.) (H.B. 2161) (effective Sep. 24, 2022). Except as limited by subsections (F) and (G), a governmental entity or official

> shall not interfere with or usurp the fundamental right of parents to direct the upbringing, education, health care and mental health of their children. A parent may bring suit against a governmental entity or official . . . *based on any violation* of the statutory rights set forth in this chapter or *any other action* that interferes with or usurps the fundamental right of parents to direct the upbringing, education, health care and mental health of their children.

A.R.S. § 1-602(E) (emphasis added). In any such action, the governmental entity or official "has the burden of proof to demonstrate both of the following:

> 1. That the interference or usurpation is essential to accomplish a compelling government interest of the highest order, as long recognized in the history and traditions of this state in the operation of its regulatory powers.
>
> 2. That the method of interference or usurpation used by the government is narrowly tailored and is not otherwise served by a less restrictive means.

A.R.S. § 1-602(F). "If the governmental entity or official is unsuccessful" in meeting those burdens, "the court shall grant appropriate relief, such as declaratory or injunctive relief, compensatory damages and attorney fees, based on the facts of the case and the law as applied to the facts." A.R.S. § 1-602(G).

¶21 The PBOR provides an explicit statutory basis for a parent to assert a claim against a school district or school official for interfering with their fundamental parental rights and imposes a substantial obligation on the governmental entity or official to justify the interference with or usurpation of those rights. The superior court did not address the obligation of MPS to justify the alleged interference or usurpation, or whether that obligation should factor into questions of standing, even though the PBOR states that a parent may sue for any PBOR violation or any other action that conflicts with the parents' fundamental rights. *See* A.R.S. § 1-602(D) ("This chapter does not prescribe all rights of parents or preempt or foreclose claims or remedies in support of parental rights that are available under the constitution, statutes or common law of this state. Unless otherwise required by law, the rights of parents of minor children shall not be limited or denied.").

¶22 Given the expansive rights afforded to parents under the PBOR, accepting MPS's position in a motion to dismiss—that every concern Doe had has been resolved—would diminish those rights. Pursuit of judicial remedies under the PBOR cannot be confined to a narrow question of whether a parent's concerns about the legal propriety of a specific factual circumstance have been resolved. If a policy that triggered those concerns remains in place, the PBOR expressly authorizes a suit to challenge the lawfulness of the policy.

¶23 Doe also has standing under Arizona's version of the Uniform Declaratory Judgments Act ("UDJA"), which states that "[a]ny person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." A.R.S. § 12-1832. A court "may refuse to render or enter a declaratory judgment . . . where such judgment . . . would not terminate the uncertainty or controversy giving rise to the proceeding." A.R.S. § 12-1836. The UDJA is "remedial" and should be "liberally construed and administered," A.R.S. § 12-1842, but a plaintiff must have "an actual or real interest in the matter for determination," *Ariz. Sch. Bds. Ass'n, Inc. v. State*, 252 Ariz. 219, 224, ¶ 16 (2022).

¶24 Doe alleged statutory violations and other actions that either interfered with or usurped her parental authority under A.R.S. § 1-602(E). For example, she claimed that (1) MPS employees at Megan's school resisted efforts by Doe to learn details about her child's education and followed established procedures designed to prevent notifying parents of changes to a student's gender identity, (2) the support plan and checklist, as used in the 2022–23 school year, contained provisions designed to help a child evade notifying their parent of changes to their gender identity at school, *supra* ¶¶ 3–5, (3) the support plan's privacy notice barred school employees from disclosing information about her child without any exception for parents, and (4) MPS tacitly encouraged or enabled students to "withhold information" from their parents in violation of A.R.S. § 1-602(C). Doe does not have to wait for additional violations of her fundamental right to parent to file suit. If the Guidelines are unlawful, she has the right under the PBOR and the UDJA to seek a judicial determination on whether MPS has interfered with or usurped her parental rights, and whether court intervention is appropriate to prevent further violations. *See* A.R.S. § 1-602(E), (G); *cf. Canyon del Rio Invs., L.L.C. v. City of Flagstaff*, 227 Ariz. 336, 341, ¶ 18 (App. 2011) ("When a justiciable controversy exists, the [UDJA] allows adjudication of rights before the occurrence of a breach or injury necessary to sustain a coercive action (one seeking damages or injunctive relief).").

¶25 By pleading violations of various provisions of the PBOR, including "any other action" that interferes with or usurps her fundamental right to parent, Doe has shown there are justiciable controversies, and the relief she seeks is not merely advisory. *See Montenegro*, 576 P.3d at 697, ¶ 18 (finding a clear case or controversy because "the parties here are adversarial to each other over the issues in the lawsuit and have fully, vigorously, and capably argued the law"); *Samaritan Health Servs. v. City of Glendale*, 148 Ariz. 394, 395 (App. 1986) (stating that a justiciable controversy exists if there is "an assertion of a right, status or legal relation in which the plaintiff has a definite interest and a denial of it by the opposing party"); *see also Ariz. Sch. Bds. Ass'n*, 252 Ariz. at 224, ¶ 16 ("[U]nder the [U]DJA, a plaintiff must show that its rights, status or other legal relations are affected by a statute, but it need not demonstrate past injury or prejudice so long as the relief sought is not advisory." (citation omitted)). And because Megan is currently enrolled in an MPS school, the issues are not moot. *Cf. Welch*, 251 Ariz. at 528–30, ¶¶ 34, 39 (explaining that a claim asserting a violation of open-meeting laws is not moot and remains actionable even after the relevant entity "ratifies" its action). Thus, the superior court erred by concluding Doe lacks standing to assert her claims.

¶26 MPS argues the Complaint was not a proper special action complaint because Plaintiffs asked the court to order MPS to take discretionary actions, rather than seek performance of a non-discretionary act. *See Sears v. Hull*, 192 Ariz. 65, 68, ¶ 11 (1998). At this point in the litigation, it is premature to determine what specific types of relief (if any) Doe may be entitled to if she prevails on the merits of her claims. Instead, on remand the superior court may address the specific remedies available to Doe (i.e., declaratory, mandamus, or injunctive relief) after further development of the record and application of the PBOR. *See* A.R.S. § 1-602(G) (stating that if the government fails to meet its burden of proving justification for the statute, policy, or practice at issue, the superior court "shall grant appropriate relief, such as *declaratory or injunctive relief*" (emphasis added)); A.R.S. § 12-2021 (providing that a "writ of mandamus may be issued . . . to compel . . . performance of an act which the law specially imposes as a duty resulting from an office, trust or station"); *Boruch v. State ex rel. Halikowski*, 242 Ariz. 611, 620, ¶ 33 (App. 2017) (recognizing that whether injunctive relief should have been granted "is a separate question, which must be addressed on a developed record in the first instance by the superior court, not this court").

## B. Walden's Standing

¶27 Walden argues the superior court erred in dismissing her claims because she has standing as an individual Board member. She argues she suffered particularized harm because she was denied the right to vote on whether to adopt the Guidelines, relying on *Adams v. Comm'n on App. Ct. Appointments*, 227 Ariz. 128, 131, ¶ 9 (2011). Her reliance on *Adams* is misplaced. The government official in that case had an individual right to make an appointment to a commission, *id.*, not a right to vote alongside others as part of a group as Walden must do.

¶28 As noted in the Board's policies, "[i]ndividual [B]oard members exercise authority over [MPS] affairs only by way of votes taken at a legal meeting of the Board. An individual board member has authority only when and to the extent that the Board, by vote, has so delegated such authority." Here, Walden disagrees with how Fourlis has implemented the Board's nondiscrimination policy through the Guidelines and related forms, *supra* ¶¶ 3–5, but as far as the record shows, that implementation predates Walden's time on the Board. The remedy she seeks—voting on the Guidelines as a Board member—is not judicial, but rather the right to participate in decisions about the superintendent's continuing employment or taking action to change MPS's official policies at Board meetings by voting on such proposals. *Cf. Brewer v. Burns*, 222 Ariz. 234, 237, ¶ 12 (2009)

("To have standing, a party generally must allege a particularized injury that would be remediable by judicial decision.").

**¶29**         Walden contends the superior court should have granted her leave to amend her complaint again to address the court's concerns about standing. We review a denial of a motion to amend a pleading for an abuse of discretion. *Carranza v. Madrigal*, 237 Ariz. 512, 515, ¶ 13 (2015). A motion to amend a pleading need not be granted if the amendment is futile. *MacCollum v. Perkinson*, 185 Ariz. 179, 185 (App. 1996). Noting that Walden already had the opportunity to amend the complaint after conferring with MPS and Fourlis, the court determined that "further leave to amend [would] not cure the deficiencies." The court did not err in dismissing Walden's claim.

## II.      Timeliness of Doe's claim

**¶30**         The superior court found that Doe's claims were untimely under A.R.S. § 12-821, which requires "all actions" against public entities or employees to be filed "within one year after the cause of action accrues and not afterward." Determining when a cause of action accrues is usually a factual question for the jury, *Walk v. Ring*, 202 Ariz. 310, 316, ¶ 23 (2002), but "it may be decided as a matter of law if the record shows when the plaintiff unquestionably [was] aware of the necessary facts underlying [his or her] cause of action," *Cruz v. City of Tucson*, 243 Ariz. 69, 71–72, ¶ 7 (App. 2017) (citation modified).

**¶31**         Neither party disputes that accrual of Doe's claims is governed by A.R.S. § 12-821.01(B), which provides that a cause of action under § 12-821 "accrues when the damaged party realizes he or she has been damaged and knows or reasonably should know the cause, source, act, event, instrumentality or condition that caused or contributed to the damage." *See State v. Ariz. Bd. Of Regents*, 253 Ariz. 6, 13, ¶ 26 (2022); *Dube v. Likins*, 216 Ariz. 406, 411, ¶ 7 (App. 2007). Under the PBOR, a court has the authority to award damages, but Doe has not requested damages. *See* A.R.S. § 1-602(G). Thus, it is not entirely clear that § 12-821 applies here. *Cf. W. Cas. & Sur. Co. v. Evans*, 130 Ariz. 333, 335 (App. 1981) ("[T]he question of whether and when statutes of limitations are applicable to declaratory relief actions is a less than clear area of the law.").

**¶32**         Yet, the legislature's use of "all" compels the conclusion that the one-year statute of limitations under § 12-821 is applicable to Doe's claims. *See Cao v. PFP Dorsey Invs., LLC*, 257 Ariz. 109, 115, ¶ 28 (2024) ("'All' means all—not less than all."); *State v. Jones*, 246 Ariz. 452, 455, ¶ 9

(2019) ("The word 'all,' one of the most comprehensive words in the English language, means exactly that."). We apply a statute's plain language as written unless doing so would yield an absurd result. *N. Valley Emergency Specialists, LLC v. Santana*, 208 Ariz. 301, 303, ¶ 9 (2004). And Doe makes no argument that requiring "all" actions against a public entity to commence within one year of accrual would be absurd.

**¶33** Doe first learned Megan was using the name Michael at school in October 2022. At the December 2022 meeting with the principal, Doe learned about the school's actions at issue here, including that the school "intentionally had not changed Megan's name in [Synergy] to avoid any notification being sent to" Doe. At that meeting, Doe requested that school personnel only refer to her child as Megan. The superior court considered Doe on notice of her potential injury on that date and thus considered her February 2024 complaint to be untimely. On de novo review, we view the record differently.

**¶34** Accepting the truth of Doe's factual allegations, unbeknownst to her, MPS did not abide by her request, or at the least, inform her it would not do so. Instead, as Doe discovered at the February 9, 2023 meeting with most of Megan's teachers, all but one continued to refer to Doe's child as Michael. Ignoring a parent's express request to refer to a child by his or her given name, and hiding the issue from the parent, at the very least presents a legitimate issue of whether MPS violated the broad protections offered to parents under the PBOR, A.R.S. § 1-602(E) ("any other action"). Failing to abide by Doe's wishes was a second violation that triggered a new accrual date. Because Doe alleges she was unaware of MPS's concealment until the February meeting, at this stage of the proceedings we conclude her Complaint, filed on February 9, 2024, was timely under § 12-821. *See Coleman*, 230 Ariz. at 356, ¶ 9.

### III. Dismissal of Fourlis

**¶35** The Complaint named Fourlis in her official capacity as superintendent of MPS. A superintendent acts under the supervision of a school district's governing board, *Batty v. Glendale Union High Sch. Dist. No. 205*, 221 Ariz. 592, 595, ¶ 11 (App. 2009), but only possesses authority specifically granted or lawfully delegated by a school district's governing board, *Godbey v. Roosevelt Sch. Dist. No. 66 of Maricopa Cnty.*, 131 Ariz. 13, 19 (App. 1981). Plaintiffs acknowledge that Fourlis "has no independent authority to implement policies for [MPS]," but she may "issue binding 'regulations for the administration of [MPS].'" Although Plaintiffs assert

that Fourlis was acting beyond the authority granted to her, they did not assert a claim against her personally.

¶36 At oral argument in this court, counsel for MPS confirmed it is defending the claims alleging unlawful Guidelines and improper actions, and counsel for Plaintiffs agreed that the lawsuit may proceed without Fourlis as a defendant. Thus, a claim against Fourlis in her official capacity is equivalent to the claim against MPS, and she is considered a redundant defendant. *See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008); *see also Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). The superior court did not err in dismissing Fourlis from the lawsuit.

## CONCLUSION

¶37 We affirm the superior court's order dismissing Walden's claim for lack of standing and Plaintiffs' claims against Fourlis. We vacate the order dismissing Doe's claims and remand for further proceedings.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**: JR

14